**John D. POTTS, Plaintiff–Appellant,**

v.

**CITY OF LAFAYETTE, INDIANA, Defendant–Appellee.**

No. 96–3593.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1997.

Decided Aug. 4, 1997.

Hamid R. Kashani (argued), Indianapolis, IN, David A. Nowak, Columbus, IN, for Plaintiff–Appellant.

james S. Stephenson, Tonya Aretz, Stephenson, Daly, Morow & Kurnik, Indianapolis, IN, for Defendant–Appellee.

Before BAUER, RIPPLE, and MANION, Circuit Judges.

BAUER, Circuit Judge.

John D. Potts attempted to attend and to tape record a Ku Klux Klan rally held in Lafayette, Indiana on October 1, 1994. After Potts was informed that he could not enter with a tape recorder, he nonetheless tried to gain access to the rally, and police officers arrested him. Potts sued the City of Lafayette ("the City"), under 42 U.S.C. § 1983, contending that he was denied entry to the rally in violation of the First Amendment, and that he was arrested without probable cause in violation of the Fourth Amendment. The City moved for summary judgment, which the district court granted. We affirm.

## BACKGROUND

The Ku Klux Klan held a rally in Lafayette, Indiana on October 1, 1994. Potts, who was preparing to write a novel set prior to the Peloponnesian War, decided to attend the rally to gather research.[1] As it turned out, Potts was arrested before he could enter the rally area.

Security at the rally involved the Lafayette Police Department ("LPD"), the West Lafayette Police Department ("WLPD"), the Indiana State Police, the Purdue University Police, the Tippecanoe County Prosecutor's Office, the Tippecanoe Sheriff's Department, as well as area businesses. Capt. Larry Danaher of the LPD coordinated the duties of the various agencies. He was aware that violence had broken out at previous rallies and that personal items, such as a reporter's tape recorder, had been used to injure attendees. In an effort to prevent injury to attendees of the Lafayette rally and to protect property and businesses in the downtown Lafayette area, Capt. Danaher drafted an operations order which prohibited persons from bringing into the rally personal items which could be used as "weapons." The operations order also addressed the allocation of officers throughout Lafayette. The order stated, in relevant part:

> WLPD will operate the entrance point and have a commander present at that area to make decisions to assist officers conducting searches of persons with metal batons. WLPD SRT team will operate at this point to monitor persons entering the rally area. Any weapons found or detected will be confiscated and not allowed into the rally area. A large sign stating that persons entering the rally area will be searched for weapons or dangerous articles will be set in view for persons entering the rally to see. Items to be confiscated and not returned will be lighters, pens, sharp instruments, and knives. This will be stated on signs listed above.
>
> * * *
>
> Media will be allowed to enter without delay after presenting proper identification, and equipment checked for weapons.

WLPD Chief Dennis Mitchell agreed to provide officers to command and man the rally entrance points. Chief Mitchell sent a memorandum to Capt. Danaher, which elaborated on the issue of "weapons." The memo stated, in relevant part:

> 2. No personal items that can be used as weapons (i.e. cameras, coins, pens, pencils, any other item deemed dangerous by the security contingent) will be allowed past the entry point of the rally. Items will not be confiscated; however, no one will be allowed into the rally with items as de-

---

1. The Peloponnesian War occurred around 431 B.C. in Greece between long-standing rivals Athens and Sparta. Potts believed the KKK rally would serve as "comparison research" for his novel, that the rally would be analogous to the period before the Peloponnesian War, in terms of "crowds going back and forth," "the whole atmosphere of it," and small groups "blaming many economic ... [and] social problems on foreigners."

It is interesting to note that Professor Herbert J. Muller of Indiana State University has stated that "[n]o war in history seems more appallingly stupid than the Peloponnesian War, which signaled the failure of the glorious Greeks." Herbert J. Muller, The Uses of the Past: Profiles of Former Societies 111 (1952). Some lawsuits seem to reach for this dubious goal.

scribed above. (See below exception pertaining to media representatives)

\* \* \*

5. Media representatives *who present valid credentials* at the entry point will be allowed to enter with only such items as are essential to their job task (i.e. limited number of pens, pencils and note pads; cameras; recorders; tripods; pagers; telephones and radios).

Prior to the rally, Federated Publications, Inc. (a corporation that publishes a local newspaper) filed an action in state court arguing that the press was unduly restricted in gathering news because it was being confined to a designated area of the rally, behind a plastic fence. On September 30, 1994, the Tippecanoe County Superior Court ordered that, upon being searched, persons with media passes would be permitted to enter the rally with tools of their trade. The LPD issued media passes to everyone who requested them.

During a routine body scan at one of the two entrances to the rally, WLPD Sgt. Matthew Coddington detected a small tape recorder in Potts' back pocket. Sgt. Coddington informed Potts that he could not enter the rally with the tape recorder unless he had a media pass. Potts then walked across the street to the other entry point, where he encountered WLPD Lt. Jerry Dean Burk, who asked Potts if he wished to enter the rally. Potts responded, "Yes, but the officer told me because I have a tape recorder, I can't go in." Lt. Burk explained that only members of the press were authorized to record the event. Potts said, "I'm not in the press, but I still think I have a right to record the event." Lt. Burk and another officer directed Potts to where he could apply for a media pass. Instead of trying to obtain a pass, Potts said, "So you're trying to tell me that you're serious enough that if I walked through the entry with the tape recorder, you would arrest me?" Lt. Burk responded that he would arrest him. Potts stated, "Then you're going to have to arrest me because I think I have a right to do that." Potts moved around Lt. Burk towards the

rally entrance, at which point Lt. Burk arrested him. Later in the day, Lt. Burk issued a citation to Potts for failure to comply with a police officer.

Potts brought suit under 42 U.S.C. § 1983 against the City and two police officers who were involved in implementing the operations order and involved in Potts' arrest. Potts contended that he was denied entry into the rally in violation of the First Amendment, and that Lt. Burk arrested him without probable cause in violation of the Fourth Amendment. The case was originally filed on January 12, 1995. Potts subsequently dismissed his claims against the two individual officers, leaving the City as the only remaining defendant. The district court granted the City's motion for summary judgment on September 23, 1996. Potts appeals, presenting essentially the same issues he raised in the district court.[2]

## ANALYSIS

### A. *Standard of Review*

■ We review the district court's grant of summary judgment *de novo. McGinn v. Burlington Northern R. Co.*, 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Matney v. County of Kenosha*, 86 F.3d 692, 695 (7th Cir.1996) (citations omitted). We view the record and extract all reasonable inferences from it in the light most favorable to the nonmoving party. *McGinn*, 102 F.3d at 298 (citation omitted). Only disputes that could affect the outcome of the suit under governing law will preclude an entry of judgment for the moving party. *Id.* (citation omitted).

### B. *First Amendment Claim*

■ Potts claims that the district court erred in granting summary judgment because there are genuine issues of material fact, which should be put before a jury, regarding whether his actions were protected under the First Amendment. We disagree. First, the application of the First Amend-

---

**2.** We deny the City's motion to strike the appen- dix attached to Potts' reply brief.

ment to the facts of a particular case is not an issue for a jury to resolve, but is a legal question for the court to decide. Moreover, there is nothing in the Constitution which guarantees the right to record a public event. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 610, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978) (explaining that the Sixth Amendment does not require that a trial be broadcast live or on tape to the public); *United States v. Kerley*, 753 F.2d 617, 620–22 (7th Cir.1985) (recognizing that the exclusion of cameras from federal courtrooms is constitutional). The right to gather information may be limited under certain circumstances.

> The privilege of a citizen of the United States to use the streets and parks for communication of views of national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in the subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939).

 The proper constitutional measure of the operations order's "weapons" ban is whether the restriction constitutes a valid time, place, or manner regulation. *See Matney*, 86 F.3d at 695. To sustain a time, place, or manner restriction on First Amendment activities, the government must show that the restriction (1) is justified without reference to the content of the regulated speech; (2) is narrowly tailored to serve a significant governmental interest; and (3) leaves open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (citations omitted).

 Regarding content-neutrality, "the principal inquiry ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (citation omitted). The controlling consideration is the government's purpose in enacting the regulation. *Id.* "A regulation that serves purposes unre-

lated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

The operations order states that, with regard to the rally, "[t]he mission of the Lafayette Police Department is to prevent violence, protect persons at the rally, and protect property and businesses in the downtown Lafayette area while groups of differing viewpoints express their beliefs." The order also states that a plan for enforcing this mission was necessary because the rally was "expected to draw groups who oppose and support [the KKK's] cause who have been violent toward the KKK in the past, and who have been violent toward one another." Nothing in the record suggests that the LPD disagreed with the content of the message of the KKK or other groups expected to attend the rally. Rather, the operations order was targeted at the "secondary effect" of bringing personal items into the rally—the possibility that attendees who had been violent at previous rallies would injure themselves, others, or property—not at the content of the views aired at the rally. *See Matney*, 86 F.3d at 696.

As for the second *Ward* factor, protecting persons and property obviously is a legitimate governmental interest, but is the operations order narrowly tailored to serve this interest? Potts deems the operations order "an exaggerated response" to the rally. He argues that the City itself did not view tape recorders as dangerous, as shown by the fact that it allowed members of the media to enter the rally with tools of their trade. Potts further points out that the City permitted individuals to take in key chains, belt buckles, shoe strings, and credit cards—items which present no less danger than a micro cassette recorder.

 A requirement is narrowly tailored if the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. at 2757). So long as "the means chosen are not substantially broader than

necessary to achieve the government's interest, [ ] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* (quoting *Ward,* 491 U.S. at 800, 109 S.Ct. at 2758).

We are satisfied that the City's goals of preventing violence and injury at the rally would be achieved less effectively absent the regulation. *See id.* at 697. KKK rallies, by their very nature, breed violence. *See Christian Knights of KKK v. District of Columbia,* 972 F.2d 365 (D.C.Cir.1992); *Wilkinson v. Forst,* 832 F.2d 1330 (2d Cir.1987); *Waller v. Butkovich,* 584 F.Supp. 909 (M.D.N.C.1984). Prohibiting persons from carrying personal items that are of such size, weight and construction that they may be hurled at a person or a glass window to cause injury or damage no doubt lessens the chance that such injury or damage will occur. The press was permitted to take in items that other attendees were not permitted to bring into the rally because the press was operating under different circumstances than the other attendees. The press serves as the information-gathering agent of the public. *Nixon,* 435 U.S. at 609, 98 S.Ct. at 1317. Allowing the press to take in pens, paper, and tape recorders was a reasonable accommodation of their First Amendment rights. Regarding the belt buckles, shoe strings, etc., that were permitted to be taken into the rally, as the district court observed, "there is large discretion under the police power to make instantaneous judgment calls based on the *de facto* situations to protect members of the public from their own conduct." The WLPD's judgment call in prohibiting tape recorders while allowing other items to be taken into the rally area in no way undermines the constitutionality of the operations order.

Finally, the operations order left open ample alternative channels of communication. Nothing in the operations order limited anyone from attending the rally or from expressing or receiving any particular message at the rally. Potts could have attended the rally and then recorded his observations from memory. Potts also could have applied for a media pass.

Also, we note that, as the district court recognized, the City was in a "Catch–22" situation. The City could have chosen not to implement an operations order and permitted everyone to attend the rally bearing any type of personal item. If violence had erupted and injury had occurred (as past litigation regarding similar rallies indicates was likely), the City might have been sued for inadequate protection of its citizens' health and safety. "[I]t is a basic principle of tort law that a town that neglects to prevent foreseeable injuries in public areas can be held liable for its negligence." *Schultz v. Frisby,* 807 F.2d 1339, 1364 (7th Cir.1986) (Coffey, J., dissenting), *rev'd,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1985). Instead, the City chose to risk possible error by taking the side of precaution and, in so doing, chanced that its chosen vehicle of precaution might be held to infringe on rights guaranteed by the First Amendment. That risk, however, never came to fruition, as we hold that the operations order was a valid manner regulation.

### C. *Fourth Amendment Claim*

Potts claims that the district court erred in deciding, as a matter of law, that Lt. Burk had probable cause to arrest him. On a procedural level, Potts argues that the issue of probable cause is one of fact that should have gone to a jury. To the contrary, "[i]f the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists." *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993). It is undisputed that WLPD officers instructed Potts, pursuant to the valid operations order, not to enter the rally with his tape recorder without first obtaining a media pass. Potts told the officers that they were going to have to arrest him because he believed he had a right to go into the rally with his tape recorder. Potts (still in possession of his tape recorder) then moved in the direction of the rally's entrance.[3] Because

---

**3.** Potts maintains that he took "one-half step to the right, when Lt. Burk took his hand and

there are no disputed facts underlying the probable cause determination, the district court was free to decide the question as a matter of law.

■■■■ As to the substantive facet of Potts' Fourth Amendment claim, Potts argues that there is no law in Indiana that criminalizes the act of attempting to attend a rally with a tape recorder, and that, therefore, Lt. Burk arrested him without probable cause. The existence of probable cause for arrest is an absolute bar to a § 1983 claim for unlawful arrest. *Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir.1990) (quoting *Mark v. Furay*, 769 F.2d 1266, 1268–69 (7th Cir.1985)).

Potts was arrested for resisting a lawful order of a law enforcement officer. Lt. Burk testified at his deposition that, at the time he arrested Potts, he did so because Potts "fail[ed] to comply with the directions that he was given and the restrictions that he was given at that point of disobeying the signs that stated that 'No Personal Items,' were allowed in and that no one was to come into that entry point with any personal effects." Lt. Burk later issued a summons to Potts for "failure to comply with a police officer."

Under Indiana law, the offense of resisting law enforcement is committed where a person "knowingly or intentionally forcibly resists, obstructs, or interferes with a law enforcement officer ... while the officer is lawfully engaged in the execution of his duties as an officer." IND.CODE § 35–44–3–3. Potts argues that he did not "forcibly" interfere with the WLPD officers' duties in operating the entrance points to the rally.

■■■ In *Spangler v. State*, 607 N.E.2d 720 (Ind.1993), the Supreme Court of Indiana analyzed what constitutes "force" under § 35–44–3–3. After reviewing the definitions of "force" in several dictionaries, the court found that "[t]he common denominators of these definitions are the use of strength, power, or violence, applied to one's actions, in order to accomplish one's ends," and concluded that "one 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties." *Id.* at 723. An act of violence toward an officer is not constitutionally required before the officer may effect an arrest for forcible obstruction of his duties. A "movement or threatening gesture ... in the direction of [an] official" will suffice. *Id.*

■■■ Upon being instructed not to enter with his tape recorder, Potts made a movement in the direction of the rally and indicated that the officers would have to arrest him in order to stop him from going in. Potts' step toward the entrance of the rally, in response to the officers' lawful orders to stay out of the rally if he did not relinquish his tape recorder, constitutes "force" as that term is understood in the context of interfering with officers' duties.[4] Potts forced himself into a position in which he was not permitted to be. An officer has a right to enforce a lawful order even if that means arresting a person who verbally refuses to obey the order and then makes a movement in furtherance of his goal of disobedience. The idea that an officer has to wait until he is belted across the mouth before effecting an arrest is too absurd to discuss.

■■■ Potts points out that several WLPD officers stated during their depositions that they did not notice any "forceful" action by Potts. An officer's subjective belief as to the legal basis for an arrest is irrelevant. Probable cause is judged by an objective standard. *Calusinski v. Kruger*, 24 F.3d 931, 935 (7th Cir.1994). Effecting an arrest under the circumstances presented by this case was not an abuse of police power; it was an intelligent exercise of such power. In short, Potts'

---

cuffed him." The extent of Potts' movement toward the entrance of the rally is of no constitutional moment.

4. Even if Potts did not commit the crime of resisting the lawful order of an officer, he certainly attempted to do so, and thereby provided an alternate basis for probable cause. *See* IND.CODE § 35–41–5–1 ("A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted.").

conduct falls within the purview of § 35–44–3–3 of the Indiana Code, and the officers therefore had probable cause to arrest him.

## CONCLUSION

For the foregoing reasons, we AFFIRM the disposition of the district court. Discussion of the parties' other arguments is unnecessary to the resolution of this case.