William Jonathan GRIDER; Lesa F. Watson, Plaintiffs–Appellants,

v.

Jerry E. ABRAMSON; E. Douglas Hamilton; The City of Louisville; David L. Armstrong; Ron Bishop; Ron Ricucci; James Vaughn, Defendants–Appellees.

No. 98–5282.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1999.

Decided and Filed June 18, 1999.

Samuel Manly (argued and briefed), Louisville, KY, for Plaintiffs–Appellants.

Paul V. Guagliardo (argued and briefed), William C. Stone (briefed), Lynne A. Fleming (briefed), Louisville, KY, for Jerry E. Abramson, E. Douglas Hamilton and City of Louisville.

Deborah A. Bilitski, Jefferson County Attorney's Office, Louisville, KY, for David L. Armstrong, Ron Bishop, Ron Ricucci and James Vaughn.

Before: KRUPANSKY, BOGGS, and CLAY, Circuit Judges.

KRUPANSKY, Circuit Judge.

The plaintiffs-appellants, William Jonathan Grider ("Grider") and Lesa F. Watson ("Watson"), have challenged the district court's dismissal, via summary judgment for the defendants, of their civil rights complaint asserting deprivations of their First Amendment liberties, and other federally created rights, allegedly caused by official actions taken by defendants-appellees City of Louisville Mayor Jerry E. Abramson, Louisville Police Chief E. Douglas Hamilton, the City of Louisville ("Louisville" or "the City"), Jefferson County Judge–Executive David L. Armstrong, Jefferson County Corrections Chief Ron Bishop, Jefferson County Police Chief Ron Ricucci, and Jefferson County Sheriff James Vaughn.[1] The plaintiffs faulted the creation and implementation of an emergency crowd control plan designed to enforce civic order in downtown Louisville on April 13, 1996, during a rally sponsored by the Ku Klux Klan ("the Klan" or "the KKK"), and a second, contemporaneous and geographically proximate counterdemonstration organized by Klan opponents. The plaintiffs have claimed that the planned extraordinary security measures, labeled the "KKK Rally Detail" (or "the plan"), de-

nied them protected free speech and association within a police-secured zone which encompassed both rally sites as well as the plaintiffs' business office, and obstructed their engagement in constitutionally safeguarded interstate commerce. The district court ruled that the record evidence could not support a finding that any action taken by any defendant infringed any constitutional guarantee. *Grider v. Abramson*, 994 F.Supp. 840 (W.D.Ky.1998).

On March 12, 1996, Christopher Johnson ("Johnson"), the self-acclaimed "Grand Klaliff of the Knights of the Ku Klux Klan," telephoned Lieutenant Colonel Cynthia Shain ("Lt. Col. Shain"), the Assistant Chief for Operations of the Louisville Police Department. Johnson informed her that the Klan planned to conduct a "public speaking forum" or "grievance rally" on the steps of the Jefferson County Courthouse in downtown Louisville ("the courthouse") on Saturday, April 13, 1996, from 12 noon to 3 p.m.. Although the City did not require demonstrators to secure a permit for gatherings outside the courthouse during non-business hours, Johnson wished to reserve the location and to alert law enforcement authorities of the KKK's plan because, although the Klansmen intended to behave peacefully, some recent Klan rallies in other cities had incited hostile reactions by offended spectators. Johnson estimated participation by 25 to 30 robed Klansmen.

Shortly thereafter, news of the scheduled Klan event circulated throughout greater Louisville. In response, several local civic organizations, coordinated by the Reverend Louis Coleman, an African–American minister, strategized a "Unity Rally" in opposition to the Klan demonstration. Coleman obtained authorization from Jefferson County ("the County") to conduct a rally at Jefferson Park, located

---

1. Each named official is identified by the office which he occupied during March and April, 1996.

across Jefferson Street from the courthouse, on the same day as the Klan gathering (April 13, 1996). Reverend Coleman's County-awarded permit approved rally hours of 10 a.m. through 1 p.m.; thus the Unity Rally would overlap the geographically proximate Klan rally for at least one hour (noon through 1 p.m.). The Unity Rally organizers slated various musical performers, group prayer sessions, and orators. Additionally, a student group had secured a parade permit for a march which would originate at the University of Louisville campus and terminate at the Unity Rally venue. Generally, the Unity Rally sponsors foresaw a well-attended morning event.

Because of the potential for violent confrontation posed by the impending opposing demonstrations, the Louisville Police Department determined that ordinary patrols of the rally sites might be inadequate, especially in the light of violence which had accompanied recent Klan protests elsewhere, including Indianapolis, Indiana. At the request of City and County administrators, two Louisville Police Intelligence Unit officers and one Jefferson County sheriff's deputy travelled to Indianapolis for a full day of briefing with an Indianapolis detective. Upon their return, the Kentucky peace officers briefed their commanders. Subsequently, additional City and County officers, including Lt. Col. Shain, conferred with a captain of the Indiana State Police who had confronted nine Klan-related disturbances. The captain's presentation included a videotaped depiction of the combat, chaos, turmoil, injuries, and multiple arrests which had accompanied a Klan rally in Indianapolis several years ago wherein ordinary police patrols had proved inadequate, but which also captured the relative calm which prevailed during subsequent Klan events in that city. The Indiana captain credited an emergency public safety contingency plan, devised following the initial tumultuous Klan event, with the successful maintenance of social order during subsequent Klan gatherings.

Simultaneously, the Louisville authorities received intelligence from local citizens, including Unity Rally organizers, that certain radical outside agitators which had in the past exhibited violent anti-Klan propensities, including members of a group known as "Anti–Racist Action" ("ARA"), might infiltrate the student march from the university. ARA operatives had distributed leaflets in the Louisville region which advocated confrontation with Klansmen at the April 13, 1996 rally. Additionally, the Louisville Police learned that a troupe denominated as the National Women's Rights Organizing Coalition might partake in the Unity Rally. That group's members were known to follow a *modus operandi* whereby, during Klan protests, they would retrieve and use dangerous objects which they had concealed in bushes or other nearby hiding places during the previous night. Indeed, despite a fruitless protective sweep of the courthouse grounds on April 11, 1996, a security officer on April 12, 1996 (the day preceding the scheduled rallies) found one whole brick plus three brick fragments, as well as six iron rebar rods, hidden in the courthouse bushes.

On April 8, 1996, defendant Louisville Police Chief Hamilton received in the mail a flyer which had been distributed in a Louisville neighborhood by the National Socialist White People's Party (NAZI). The sender, a concerned black resident, had written thereon that "we, the black citizens, need to be protected from threat of harm." Moreover, local racial tensions mounted with the scheduling of an April 3, 1996 rally at the Louisville Hall of Justice by a civil rights group known as "People's Rights in Demanding Equality" ("PRIDE") to protest a racially charged incident whereby a caucasian resident of a predominantly white Louisville neighborhood had allegedly shouted offensive racially segregationist threats at a 23 year old African–American mother and her five year old son, which he had punctuated by

the firing of five bullets. Furthermore, the police learned that an urban street gang, the Victory Park Players (affiliated with the notorious "Crips" gang), had proclaimed that new recruits would be required, as an initiation rite, to commit a serious crime at the Klan rally. The police believed that the gangs generally grant the slaying of a police officer the highest esteem.

In this anxious and potentially explosive environment, the Louisville police and civil authorities resolved to initiate prophylactic steps to forestall the disorder, hostilities, and consequent personal injuries and property damage patently threatened by the imminent conflicting rallies. Lt. Col. Shain, who had been favorably impressed by the documented effectiveness of the Indianapolis contingency plan, subsequently conferred with other urban police agencies which had also successfully managed Klan rallies in the recent past, including Austin, Texas; Coshocton, Ohio; Columbus, Ohio; Denver, Colorado; and Lafayette, Indiana. The distilled essence of their collective advice counselled that peace officers should subject the Klan ralliers to magnetometer (metal detector) searches at a locus distant from the rally situs, and subsequently bus them under guard to the rally location. They suggested that the authorities should physically insulate the Klan staging area from the general public via an enforced buffer zone. Moreover, the experienced departments recommended that all dangerous objects, including guns, knives, lug nuts, ball bearings, batteries, rolled coins, poles, and sticks, be banned from the protest locale. Although Lt. Col. Shain had planned a massive law enforcement presence at the rallies, she concluded that ordinary patrols would be unable to prevent violence in the absence of the additional special restrictions advised by the consulted sister police departments.

Consequently, Lt. Col. Shain, with the advice and approval of key City and County officials including the named defendants, devised a contingency plan (the KKK Rally Detail) to prevent violence, maintain order, and respond to disturbances during the April 13, 1996 rallies. The plan contemplated deployment of approximately 600 law enforcement and corrections department personnel for crowd control and arrestee transport purposes. Moreover, the KKK Rally Detail delineated a "restricted area" surrounding the rally sites. A high-security "inner perimeter" consisted of the central hotbed of the planned rallies. The "outer perimeter" encompassed a several city block radius surrounding the inner perimeter, wherein parking would be banned, and vehicular traffic would be rerouted, by the numerous officers to be stationed throughout that area. No automobiles would be permitted into the inner perimeter during the rallies. The KKK Rally Detail engineered the physical segregation of Klan members and sympathizers from Unity Rally supporters by creation of a high-security barricade within the inner perimeter, erected out of bike-rack fencing.[2] No civilians were to be allowed entry into that police-controlled *cordon sanitaire*.[3]

The KKK Rally Detail further posited that any person who desired to attend either rally, or both, must submit to a predicate magnetometer search at a central entrance to the inner perimeter. Persons who were detected with, but declined to surrender, potentially hazardous objects, were to be denied access to the inner perimeter. However, all persons free of such objects were afforded an option to

---

**2.** "Bike-rack fencing" (referred to below as "jersey fencing") consists of portable four foot high segments of metallic vertical slats resembling small bicycle racks.

**3.** Additionally, at the request of Klan rally planners, the police constructed a barrier within the Klan rally zone which insulated the Klan speakers from spectators. By contrast, audience members within the Unity Rally district could freely mingle with scheduled speakers and organizers.

attend either the Klan gathering or the Unity Rally; no person would be denied access to either rally for any reason except possession of dangerous devices. The KKK Rally Detail provided for the erection of one bike-rack fencing passageway leading to the Klan event and another leading to the Unity Rally. Prominent signs would indicate the terminus of each channel. No one was required to declare any allegiance, affiliation, or political belief to gain admission to either meeting. Any person wishing to participate in both gatherings was required to initially select one of the two events; after that person had experienced that rally, he or she could exit that area, pass once again through the free-standing magnetometer, and select the bike-rack fence pathway leading to the alternate rally location. Moreover, because only a street, bike-rack fencing, and law enforcement officers separated the two rallies, the police barricade did not substantially obstruct the ability of rally attendees to see and hear the proceedings at the opposing demonstration. However, no one could freely wander between the two rallies because of the intervening buffer zone.

The KKK Rally Detail specified that no one would be denied access to any business establishment within the restricted area. However, as a courtesy, the Louisville police prior to April 13, 1996, broadcast informational leaflets within and near the restricted area which described the planned mobility restrictions and the cancellation of postal delivery and garbage collection services on the implicated Saturday, warned of possible violence, and suggested that area enterprises consider closure on that day.

Plaintiff Watson is a legal assistant employed by lawyer Samuel Manly, counsel for both plaintiffs in the instant action. Manly shared office space with plaintiff Grider, an attorney, in the Kentucky Home Life Building, a structure situated within the restricted area. On April 11, 1996, the plaintiffs instigated their complaint for damages, equitable relief, and attorney fees,[4] simultaneously petitioning for a restraining order and preliminary injunction against execution of the KKK Rally Detail, contending that it would divest them, on April 13, 1996, of their First Amendment guarantees of free speech, assembly, and association, as well as other alleged federal rights. On April 12, 1996, after presiding over an evidentiary hearing, the district court denied any equitable relief by way of restraint on the police plans.

City and County law enforcement personnel implemented the KKK Rally Detail on the following day. However, prevailing inclement weather, including rain and cold, discouraged massive public attendance at the rallies on April 13, 1996; no conflicts and/or violence erupted between the members, fellow travellers, participants, and/or observers attracted to either of the rallies and the collateral events conducted in conjunction with the scheduled rallies; and no arrests were made.

The plaintiffs have anchored their complaint primarily in 42 U.S.C. § 1983[5] and the First Amendment to the United States Constitution.[6] They have theorized that

---

4. The complaint also sought certification of a class of persons allegedly adversely impacted by the KKK Rally Detail. That issue is not before this reviewing bench.

5. That enactment posits, in material part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

6. This constitutional proviso recites, in relevant segment:
 Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble....
 U.S. Const. amend. I.

the KKK Rally Detail was unconstitutional *per se* because allegedly inadequate legislative authority or official administrative policy guided its creation, adoption, and implementation. They have also complained that the KKK Rally Detail as implemented violated their federal rights because it subjected them to magnetometer searches; prevented them from delivering speeches within the restricted area or speaking and/or associating simultaneously with the participants of both rallies; and impeded their business activities. The material facts were largely uncontested, which prompted cross motions for summary judgment. On January 27, 1998, a district judge (who was not the same judge who had previously overruled the plaintiffs' petition for a temporary restraining order or a preliminary injunction) denied the plaintiffs' summary judgment motion but sustained each defendants' motion, thereby dismissing the plaintiffs' complaint with prejudice.[7] The plaintiffs noticed a timely appeal on February 25, 1998.

 On appeal, the plaintiffs have abandoned their claim for compensatory damages for past injuries. They instead have contested only the lower court's denial of prospective declaratory and injunctive relief and attorney fees. Accordingly, this cause may be considered moot because the KKK Rally Detail has already been implemented. Federal courts possess subject matter jurisdiction only over actual cases or controversies. U.S. CONST. art. III, § 2. The "case or controversy" justiciability requirement must be satisfied "at all stages of review, and not simply on the date the action is initiated." *Ahmed v.*

*University of Toledo,* 822 F.2d 26, 27 (6th Cir.1987) (citation omitted). Ordinarily, a federal court's jurisdiction over a pending litigation divests immediately upon termination of its "actual controversy" status. *Thomas Sysco Food Services v. Martin,* 983 F.2d 60, 62 (6th Cir.1993). However, a well established exception to the mootness doctrine permits the adjudication of an otherwise moot controversy which is "capable of repetition yet evading review." *Pinette v. Capitol Square Review and Advisory Board,* 30 F.3d 675, 677 (6th Cir. 1994), *aff'd,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia,* 972 F.2d 365, 369–70 (D.C.Cir.1992).

In the case *sub judice,* the Klan advised the Louisville police of its demonstration plans only one month prior to the event, and the Unity Rally organizers afforded even shorter notice. An obvious likelihood exists that, at some point in the future, the Klan and its opponents, or other mutually antagonistic groups which advocate incompatible and contradictory emotionally charged social or political agendas, will schedule public counter-demonstrations in Louisville on short notice which will pose the same risks of disorder and injury as the subject rallies, which in turn will trigger implementation by the police of a contingency plan similar to the KKK Rally Detail. Accordingly, because the salient features of the KKK Rally Detail, as they impacted the plaintiffs, are capable of repetition but otherwise will elude appellate examination, they are subject to immediate review.

---

7. A court may grant summary judgment under FED.R.CIV.P. 56 only if, after construing the record evidence, and reasonable inferences which may be drawn therefrom, most favorably for the party opposing the motion, the proof could not support a judgment in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, a lower court's summary judgment award is reviewed *de novo,* because the legal sufficiency of the rec-

ord evidence which supports the nonmoving party's case poses a question of law. *See Doe v. Claiborne County,* 103 F.3d 495, 505 (6th Cir.1996). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (*quoting Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ Initially, the plaintiffs have vaguely charged that the KKK Rally Detail violated the First Amendment *per se* because City and County law enforcement authorities allegedly regulated public speech, association, and assembly within the restricted area on April 13, 1996 in the absence of any legislative authorization or approval by official policymakers. At bottom, the concept that each and every police action designed to maintain public order which impacts public speech or assembly, including the preparation and execution of emergency safety procedures, transgresses the First Amendment unless that action was legislatively authorized or approved by policymaking officials, was misconceived.

In support of their novel posture, the plaintiffs have cited decisions which have ruled that a legislative or administrative delegation of permit-granting authority to a government actor must be coupled with clear guidelines which limit official discretion, in order to preclude arbitrary content-based discrimination which might otherwise prevail under ambiguous or open-ended criteria. *See, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (ruling that a county ordinance which invested a government administrator with discretion to exact a parade or assembly permit fee in any sum up to $1,000 was unconstitutionally overbroad); *Kunz v. New York*, 340 U.S. 290, 294, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (explaining that legally

unrestrained discretion delegated to administrative bodies or officials to regulate activities protected by the First Amendment violates the constitution); *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1134 (6th Cir.1991) (remarking that unguided administrative permit-awarding discretion enables illegitimate governmental discrimination animated by anticipated speech content or the speaker's politics).

By contrast, in the instant action, the plaintiffs had not applied for, and hence had not been denied, a speech or assembly permit by an official whose discretion was unchecked by appropriate legal guidelines. Rather, the gravamen of the plaintiffs' complaint was that certain actions taken by City and County law enforcement operatives on the day of the rallies deprived them, as members of the general public, of certain federal rights. Accordingly, this court's proper focus is upon whether the KKK Rally Detail as implemented by City and County agents offended the plaintiffs' constitutional rights, not upon the degree of discretion exercised by the drafter(s) of that plan, or upon the absence of legislative or administrative policy guidance or approval.[8] Even if Lt. Col. Shain, on behalf of the City police department, created and enforced the KKK Rally Detail solely on her own authority, no *per se* constitutional infraction occurred, because peace officers, in discharge of their professional obligation to execute the police powers of local government,[9] as well as the obli-

8. Indeed, the basic premise of the plaintiffs' *per se* unconstitutionality argument was, at least in part, facially fallacious. The record reflected, and indeed the plaintiffs' complaint alleged, that the KKK Rally Detail was drafted by Lt. Col. Shain with the input and approval of defendant City and County policymakers, namely the mayor of Louisville (Jerry E. Abramson), the City's police chief (E. Douglas Hamilton), the County's sheriff (James Vaughn), the County's police chief (Ron Ricucci), the County's Judge–Executive (David L. Armstrong), and the County's Chief of Corrections (Ron Bishop). Thus, although no statute, ordinance, or written administrative policy specifically authorized or approved the KKK Rally Detail, that plan had been

authorized and approved by key superior City and County policymakers.

9. Traditionally, the broad "police power" of the states and their local subdivisions includes the authority and duty to regulate community health and safety. *De Buono v. NYSA–ILA Medical and Clinical Services*, 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). Stated differently, local government should act to protect the "lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation omitted). *See Commonwealth v. Beasy*, 386 S.W.2d 444 (Ky.1965) (declaring that Louis-

gations imposed by 42 U.S.C. § 1983 upon agents of the states and their local instrumentalities to avoid impositions upon individual exercises of constitutional freedoms, must take the actions necessary to protect the physical safety of citizens, the exercise of the speech and assembly rights of rally organizers, and the overall public order. *See Glasson v. City of Louisville,* 518 F.2d 899, 906–07 (6th Cir.1975) (explaining that a police officer has an obligation to take reasonable action to protect from violence persons exercising their constitutional speech and assembly rights); *Potts v. City of Lafayette, Indiana,* 121 F.3d 1106, 1110–12 (7th Cir.1997) (sustaining, over a First Amendment challenge, the implementation of a police-drafted emergency weapons ban which incorporated blanket metal baton body scans of Klan rally attendees).

Hence, the constitutionality of a law enforcement measure, such as the KKK Rally Detail, taken in furtherance of a criminal justice enforcement agency's inherent public safety responsibilities, must be evaluated relative to the actual impact that measure had upon a particular plaintiff.[10]

 Next, the plaintiffs have asserted that the authorities, by subjecting them to mandatory magnetometer searches as a prerequisite to admission to either rally situs, impermissibly chilled their exercise of First Amendment free expression and association rights. Governmental *content-based* regulation (that is, a restriction triggered by the speaker's message) of the time, place, and manner of speech and associational activities conducted within a "traditional public forum"[11] is typically subject to the highest degree of constitutional scrutiny, namely the "strict scrutiny" test, whereby the subject regulation may withstand constitutional review only if it was *necessary* and *narrowly* tailored to achieve a *compelling* public interest. *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 761 (1995); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). By contrast, *content-neutral* regulation of the time, place, and manner of speech and associational activities conducted in a traditional public forum is evaluated with reference to the relaxed "intermediate scrutiny" standard, whereby a public restriction will survive constitutional assessment if the implicated measure was narrowly fashioned to further a *significant* governmental interest, and it leaves open ample alternate channels of

ville's police power is as broad as that of the state of Kentucky).

10. *See Norwood v. Bain,* 166 F.3d 243, 249 (4th Cir.1999) (*en banc*) (Wilkens, J., writing separately, joined by Williams, Traxler, and Niemeyer, J.J.) (commenting, in a case involving checkpoint searches, for weapons, of motorcycle saddlebags and unworn clothing possessed by individuals who intended to enter a motorcycle rally area, instituted by the police in response to a past history of violent confrontations at such events between members of rival outlaw motorbike gangs, that "the Supreme Court has never intimated that a special needs assessment search cannot be reasonable in the absence of legislative or administrative approval. Moreover, a rule that a special need cannot support a search unless the potential harm justifying the search has been identified in public records would be artificial and unworkable. Undoubtedly, a warrantless search designed to avert great harm that may be avoided only by an extremely limited and unintrusive type of search applied in a very evenhanded manner is not unreasonable simply because it is not authorized by a legislative or regulatory scheme. Rather, the genuineness and substantiality of the need for the search must be evaluated on a case-by-case basis.")

11. A "traditional public forum" is public "property [which] has by law or tradition been given the status of a public forum," as opposed to publicly owned real estate which has instead "been reserved for specific official uses." *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (*citing Cornelius v. NAACP Legal Defense & Ed. Fund,* 473 U.S. 788, 802–03, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). The litigants at bench have stipulated that the Louisville courthouse steps and Jefferson Park are traditional public fora.

communication.[12] *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

At a superficial glance, the assaulted magnetometer searches appear to constitute content-neutral time, place, and manner restrictions narrowly crafted to serve significant public interests in the maintenance of public safety, security, and order, including the physical protection of rally participants, spectators, passers-by, and law enforcement personnel; as well as preservation of the free speech and assembly rights of rally institutors and participants.[13] Neither plaintiff was selectively searched by reason of his or her statements, political affinity, personal appearance, or any other arguably ideological content-driven criteria; rather, every person entering the restricted area was searched in the same manner for the same facially content-neutral reason (the detection of dangerous implements). *See, e.g., Potts*, 121 F.3d at 1111–12. Nevertheless, the Supreme Court has dictated that government regulation of speech or assembly activities by speakers, motivated by anticipated *listener reaction* to the *content* of the implicated communication, is *not* content-neutral. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–36, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). *See also Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia*, 972 F.2d 365, 373–74 (D.C.Cir. 1992) (pronouncing that officially imposed restrictions on the Klan's march route, inspired by fears of hostile responses to the Klan message, were not content neutral regulations). Similarly, government regulation of the speech, assembly, or association activities of members of a public speaker's audience, when triggered by fears of hostile listener response to the content of that speech, is not content neutral.

Construing the predicate magnetometer search of each rally attendee mandated by the KKK Rally Detail as a *content-based* speech and association limitation designed to defuse a riot or other hazards related to unruly responses to speech content, it nonetheless patently constituted a necessary constraint narrowly fashioned to further a compelling governmental interest in public safety and order. Based upon the information known to the defendants during the drafting and execution of the KKK Rally Detail, which evidenced a significant risk of serious violence in the absence of extraordinary crowd management measures, magnetometer searches of all persons attempting to enter the restricted area for weapons was among the least restrictive available means of preserving social order and safeguarding the physical security of all persons while concurrently minimizing burdens upon the exercise of any citizen's First Amendment privileges. *See Wilkinson v. Forst*, 832 F.2d 1330, 1340–41 (2d Cir.1987) (characterizing general magnetometer screenings of Klan rally participants and their packages as the least intrusive means of addressing and preempting threatened violence).

The authorities commendably refrained from adopting alternate peacekeeping techniques which might have been

---

**12.** Generally, a tripartite test governs the assessment of legislation or other public measures which affect the exercise of constitutional rights. Neither strict scrutiny nor intermediate scrutiny govern public enactments or official actions which do not invade any fundamental right such as a First Amendment freedom, and do not adversely impact uniquely a suspect or quasi-suspect class; rather, they are reviewed with reference to the least rigorous of the three norms, the deferential "rational relationship" test, whereby governmental rules or initiatives are sustained if they are *ra-* *tionally related* to the advancement of a *legitimate* state interest. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440–41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Equality Foundation v. City of Cincinnati*, 128 F.3d 289, 292 n. 1 (6th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 365, 142 L.Ed.2d 302 (1998).

**13.** *See, e.g., Glasson*, 518 F.2d at 906.

even more effective but concurrently more obstructive of robust public debate and intrusive upon individual rights, such as scheduling the rallies on different days or in different geographic areas, or physically searching every rally attendee. Accordingly, the City and County did not deprive the plaintiffs of any interest protected by the First Amendment by compelling their submission to magnetometer searches as a condition precedent to entry into the restricted area.[14]

■ The plaintiffs have also urged that their free association rights were violated by the physical segregation of the two rallies by bike-rack fencing and law enforcement officers which prevented their simultaneous discourse with the attendees at both events. *See Evans v. Newton,* 382 U.S. 296, 298, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (commenting that the government may not infringe a citizen's right "to pick his own associates so as to express his preferences and dislikes, and to fashion his private life by joining such clubs and groups as he chooses."). However, the KKK Rally Detail did not preclude the plaintiffs from *sequentially* associating with the members of both gatherings. Although the plaintiffs' trans-rally mobility may have been moderately restrained by their inability to walk directly from one rally situs to the other without first exiting the initial restricted area of attendance and then being required to pass through the magnetometer station a second time, any resultant imposition upon their free association rights was trivial when juxtaposed against the compelling state interest in separating the two mutually antagonist and potentially hostile congregations. Indeed, as developed herein, the sequestering of the counter-demonstrators encouraged, rather than impeded, free speech and assembly rights, in that it safeguarded rally participants from expression-stifling intimidation and threatened injuries.

■ The plaintiffs have ᵉ further averred that they suffered a constitutional tort by reason of their alleged inability to orate within the restricted area.[15] Initially, this appeal will consider the exclusion of all private citizens from the police-occupied buffer zone within the inner perimeter, which *a fortiori* also foreclosed public speech by any civilian. Although all persons were forbidden to speak within that area irrespective of anticipated speech con-

14. The plaintiffs, in their appellate reply brief, advanced a Fourth Amendment "unreasonable search" argument under *Terry v. Ohio,* 392 U.S. 1, 25–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (ruling that the stop and frisk of a citizen supported by a reasonable articulable suspicion that the target was armed and dangerous was valid under the Fourth Amendment) and *Sibron v. New York,* 392 U.S. 40, 63–64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (explaining that a stop and frisk which was not supported by a *Terry* reasonable suspicion violated the Fourth Amendment). However, "[i]ssues raised for the first time in a reply brief are not properly before this court." *United States v. Perkins,* 994 F.2d 1184, 1191 (6th Cir.1993).

Even if the Fourth Amendment claim had been preserved for review, it was misconceived. *See Wilkinson v. Forst,* 832 F.2d 1330, 1339–41 (2d Cir.1987) (mandating that blanket magnetometer searches of persons attending a Ku Klux Klan rally designed to detect and exclude firearms, even in the absence of "individuated suspicion" or "probable cause," comported with Fourth Amendment reasonableness strictures, analogizing the implicated safety concerns to those which justify routine airport and courthouse magnetometer searches).

15. Neither plaintiff attempted to address any group audience, either within or outside the restricted area, on April 13, 1996. However, the plaintiffs have asserted that each would have spoken at the rallies but for Lt. Col. Shain's testimony at the April 12, 1996 evidentiary hearing that no one except scheduled speakers would be permitted to speak at either rally, and Grider's alleged observation at the rally that the police evicted some spectators who had attempted oration. However, the written KKK Rally Detail was silent regarding unscheduled speakers. Nonetheless, construing the record most favorably for the plaintiffs as the opponents of summary judgment, this review will assume that, on April 13, 1996, law enforcement operatives disallowed unscheduled public presentations within the restricted area.

tent or political affiliation, the police buffer zone was created to prevent potential violence instigated by speech *content,* and thus comprised a content-based stricture. *Forsyth County,* 505 U.S. at 134–36, 112 S.Ct. 2395. Beyond contradiction, however, that circumscription constituted a necessary and narrowly tailored means of promoting the compelling public interest in preserving community peace and safety, especially in the face of threatened violence which might impede free expression by the rally participants. Hence, that restriction satisfied controlling constitutional "strict scrutiny" standards. *Perry Educ. Ass'n,* 460 U.S. at 45–46, 103 S.Ct. 948.

Turning to police limitations upon public speech imposed elsewhere within the restricted area, the plaintiffs have asserted that the authorities prohibited *all public speech by non-scheduled speakers* in both insulated rally districts *irrespective of content;* they did not allege that the police silenced only speakers whose speech content threatened to incite a hostile response. Hence, unlike the magnetometer screenings, segregation of the two rival assemblies, and enforcement of an off-limits intermediate zone, which limited precautionary controls were implemented to avoid violent reactions to the *content* of ideological expressions, the general ban on nonscheduled public addresses within the rally venues was not fashioned to prevent content-driven violent responses but instead to facilitate orderly and discernible presentations by pre-arranged commentators and performers.

Moreover, the plaintiffs nevertheless had ample alternate channels of public communication to proclaim their philosophical, political, or other agendas within the immediate geographical area of the two scheduled rally sites by carrying signs or banners, broadcasting on a street corner located outside but adjacent to the restricted area, speaking within the temporarily restricted area after the scheduled presentations had been completed, and/or by arranging their own rally at a site outside the restricted area, all of which available options undercut the plaintiffs' argument that their speech had been unlawfully restricted. *See, e.g., Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298–99, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Accordingly, the alleged general ban on non-scheduled speech within the restricted area but outside of the median buffer zone constituted a classic *content-neutral* time, place, and manner regulation. *Id.*

That restriction was narrowly focused upon promoting the City's and County's significant public interests in fostering the privileges of free expression and assembly of all participants who wished to see and hear the formally sanctioned presenters. No evidence indicated that either plaintiff had endeavored to secure placement on the official speakers' roster at either rally. In all events, the rally organizers were entitled to select and schedule public speakers, which entailed the power to exclude from their rostrum any unapproved would-be speaker. *Cf. Hurley v. Irish–American Gay, Lesbian and Bisexual Group,* 515 U.S. 557, 572–81, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); *Sistrunk v. City of Strongsville,* 99 F.3d 194, 198–200 (6th Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997).

Moreover, the formally slated speakers possessed a protected interest in addressing their audience under orderly and audible conditions. *See Glasson,* 518 F.2d at 907 (commenting that the police should take all reasonable and necessary steps to protect the exercise of First Amendment rights by "peaceable, orderly speakers, marchers or demonstrators" against those who would interfere with those protected activities). They had a right to be free from interruption by disorderly outside elements intent upon disruption and inciting possible physical conflict. *Id.* at 906 (remarking that the police are obligated to prevent suppression of public speech by a

"heckler's veto" or other actions by spectators). Accordingly, even if the defendants had prevented the plaintiffs from attempting to speak out of turn at either of the scheduled rallies, no First Amendment breach would have resulted.

■ Finally, the plaintiffs have argued that, on April 13, 1996, the parking bans, road closures, and requisite magnetometer searches imposed by the KKK Rally Detail which allegedly impeded access to their office building, and the concurrent cancellation of postal delivery and rubbish removal services, concomitantly interfered with engagement in their trade or profession; and also obstructed their access to other shops and offices within the restricted area. They have characterized those effects as offensive to their rights protected by the Commerce Clause, U.S. CONST. art. 1, § 8, cl. 3 (empowering Congress "[t]o regulate Commerce ... among the several States ...").[16] *See Dennis v. Higgins*, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (dictating that, in proper cases, private lawsuits may be initiated under section 1983 anchored in state actions which allegedly intruded, to the plaintiff's damage, upon exclusive federal regulation of interstate commerce). Nonetheless, even assuming *arguendo* a suffi-

cient nexus to interstate commerce, the instant plaintiffs have alleged only a *de minimis*, if any, Commerce Clause violation.

■ The uncontradicted evidence disclosed that the authorities compelled the closure of no business in the restricted area, and no one, including either plaintiff, was denied access to any operating commercial concern, including their own offices. No evidence existed that any person wishing to transact business with the plaintiffs was excluded from their building. The plaintiffs have complained of minor inconveniences which may have resulted, if at all, from extraordinary temporary crowd control measures necessarily effectuated on a single Saturday. Those emergency restrictions were closely linked to the preservation of citizens' constitutional liberties as well as prevention of disorderly conduct, breaches of the peace, and serious injuries to persons and property. No significant impediment against the plaintiffs' abilities to move freely, practice their trade or profession, or transact other commerce was imposed on the day in controversy. Thus, the plaintiffs' Commerce Clause claim is misconceived.[17]

Overall, the record evidence disclosed that the instant plaintiffs' assertions that

**16.** "Although the language of that Clause speaks only of Congress' power over commerce, 'the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade.'" *Dennis v. Higgins*, 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (*quoting Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)).

**17.** For similar reasons, the plaintiffs' claim that the KKK Rally Detail deprived them of their alleged right to engage in their chosen occupation or profession in purported affront to the Due Process Clause of the Fourteenth Amendment was inapposite. *See* U.S. CONST. amend. XIV, § 1 ("No state shall ... deprive any person of ... liberty, or property, without due process of law."). However, the Supreme Court recently instructed that an attorney has no interest in practicing his profession which is protected by the Due Process Clause against "the inevitable interruptions of our daily routine as a result of legal process

which all of us may experience from time to time." *Conn v. Gabbert*, — U.S. —, —, 119 S.Ct. 1292, 1296, 143 L.Ed.2d 399 (1999) (resolving that the search, pursuant to warrant, of an attorney during his client's grand jury testimony did not deprive the lawyer of any due process right to practice his profession). The *Conn* Court further noted that "[i]n a line of earlier cases, this Court has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation.... These cases all deal with a complete prohibition of the right to engage in a calling, and not the sort of brief interruption which occurred here." *Id.* at 1295–96 (citations omitted). Accordingly, the alleged brief insignificant intrusion upon the plaintiffs' engagement in their occupations on the day of the rallies, if any in fact existed, did not rise to the level of

the faulted measures actualized by the KKK Rally Detail constituted *ad hoc,* unnecessary, oppressive, draconian, arbitrary, heavy-handed, alarmist, overreactive, and unbridled nefarious authoritarian "police state" exercises of power were inapposite and ill founded. Much to the contrary, the Louisville police, in conjunction with other City and County authorities, should be commended for their conscientious effort to carefully formulate a highly prudent, circumspect, and well conceived emergency action plan calculated to address realistic concerns and threats of social disorder, personal injuries, property damage, and individual rights violations posed by the impending counter-demonstrations. While developing the KKK Rally Detail, its drafters, especially Lt. Col. Shain, thoroughly researched, and intelligently evaluated, the recent experiences of coordinate law enforcement agencies. The ultimate plan was an eminently rational and appropriate tool for the management of conflicting interests, both public and private, which accorded due weight to the preservation of community peace and safety within a milieu which remained maximally conducive, given the reasonably anticipated circumstances, to individual and collective exercises of constitutional rights. Because the minor inconveniences experienced by Grider and Watson were byproducts of official actions which, whether considered individually or collectively, were narrowly tailored to advance compelling public interests, the plaintiffs as a matter of law could not prevail against any defendant on any asserted federal rights claim under section 1983.

This reviewing court has carefully considered the additional assignments of error proffered by the plaintiffs and has concluded that they also lack merit. Accordingly, the judgment of the district court is **AFFIRMED**.

a violation of any due process right to select and pursue their vocations. *See id.* at 1296.