John BLAIR, Plaintiff,

v.

CITY OF EVANSVILLE, INDIANA; Officer William Welcher, in his Individual Capacity; Officer B. Hildebrandt, in his Individual Capacity; Officer C. Jones, in his Individual Capacity; and Officer G. Weber, in his Individual Capacity, Defendants.

No. 3:30–CV–003–LJM–WGH.

United States District Court, S.D. Indiana, Evansville Division.

March 17, 2005.

Kenneth J. Falk, Indianapolis, IN, for Plaintiff.

David L. Jones, Bowers Harrison LLP, Evansville, IN, for Defendants.

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MCKINNEY, Chief Judge.

This cause is now before the Court on the plaintiff's, John Blair ("Blair"), Motion for Partial Summary Judgment and the defendants', City of Evansville, Indiana ("Evansville"), Officer William Welcher ("Welcher"), Officer B. Hildebrandt ("Hildebrandt"), Officer C. Jones ("Jones") and Officer G. Weber ("Weber") (individuals collectively, the "individual Defendants," all defendants collectively, "Defendants"), Motion for Summary Judgment on Blair's claims under 42 U.S.C. § 1983 and Indiana state law. Blair contends that on February 6, 2002, Defendants violated his First Amendment right to protest during Vice President Richard Cheney's visit to the Centre in Evansville, Indiana, when they insisted that he protest in a designated area. In addition, Blair contends that the individual Defendants violated his Fourth Amendments rights on that date when they arrested him without probable cause. Blair asserts that his arrest also violated Indiana state tort law.

The motions have been fully briefed, and for the reasons stated herein, the Court **GRANTS in part and DENIES in part** Blair's Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Defendants' Cross Motion for Summary Judgment.

### I. BLAIR'S MOTION TO STRIKE

In support of their opposition to Blair's partial motion for summary judgment and in support of their own motion for summary judgment Defendants have proffered an affidavit from Welcher and several declarations from Roger Veal ("Veal"), Special Agent with the United States Secret Service ("Secret Service"). Blair has moved to strike portions of both proffers. The Court addresses each affidavit in turn.

### A. WELCHER'S AFFIDAVIT

■ Blair argues that the following affirmations in Welcher's affidavit are hearsay:

3. In designating the security zone around the Centre, Agent Chineme specifically directed that for security reasons no one would be permitted to stop, stand or demonstrate within the security zone, but they could pass through as long as they did not stop.

4. Agent Chineme selected the location of the protest area and pointed out that the location was a public area within close proximity to the venue for the Vice President's appearance and would still be visible to the Vice President on his drive into the Centre

Welcher Aff. ¶¶ 3 & 4. Defendants contend that statements attributed to Agent Chineme fall under two exceptions to the hearsay rule, Federal Rules of Evidence 804 and 807 ("Rules 804 and 807"). Agent Chineme is no longer with the Secret Service and the Secret Service has no forwarding information for him, therefore, he is unavailable to testify. Moreover, the statements are the most probative evidence on the subject that Defendants can procure through reasonable efforts. Blair argues that this statement does not have sufficient indicia of reliability for admission under Rule 807.

The Court finds that Welcher's statements are admissible, but not because they fall under a hearsay exception, but because they can be used to prove something other than the matter asserted. There is no argument that a statement offered into evidence for a purpose other than "to prove the truth of the matter asserted" is not hearsay. *See* Fed.R.Evid. 801(c). Here, Welcher is entitled to explain why he, his fellow officers and Evansville both designated a specific area as a "security zone" around the Centre and designated a special "protest area." Blair does not dispute the fact that the Secret Service is charged to protect the Vice President of the United States nor does he dispute that any plan to protect the Vice President at venues such as the Centre in Evansville relies upon the cooperation of federal, state and local law enforcement and public safety agencies. *See* 18 U.S.C. § 3056; 1st Veal Decl. ¶ 4. Moreover, Blair includes in his statement of facts that either David Gulledge ("Gulledge"), Evansville Chief of Police, or Welcher, who had delegated authority from Gulledge, explicitly approved the decision to make the area around the Centre a no-demonstration zone. Gulledge Dep. at 19. In other words, the plan referenced by Welcher and statements attributed to Chineme were approved by a party in suit and not hearsay as an admission of a party-opponent.

In light of these facts, the statements in Welcher's affidavit may be used by Defendants to explain the security plan set up for Vice President Cheney's visit to the Centre. This is an appropriate purpose for Welcher's statement that is not hearsay. For this reason, and for this purpose, Welcher's affidavit statements in paragraphs 3 and 4 are admissible.

## B. VEAL'S DECLARATIONS

In addition to portions of Welcher's affidavit, Blair also seeks to strike portions of Veal's declarations. Specifically, Blair contends that the following statement is conclusory and impermissible opinion testimony:

> 4. While I was not involved in the decision to establish an area for demonstrators and others who wished to congregate near The [sic] Centre, the area so designated was the nearest feasible location for groups to safely gather given the need to maintain a clear route for the motorcade and emergency vehicles and the set off distances needed to mitigate the effectiveness of a variety of weapons.

2d Veal Decl. ¶ 4. In a third declaration, Veal explains that he "was personally involved with, and participated in, developing the security plan for the Vice President's visit to [t]he Centre on February 6, 2002." 3d Veal Decl. ¶ 2. In conjunction with his duties, he "visited the site in advance of the visit, assessing the facility itself and the means of accessing the facility by vehicle...." *Id.* ¶ 3. Furthermore, Veal states,

> During preparation for the visit, I was apprised of the location where members of the public would be permitted to gather. As a Special Agent with the Secret Service since 1983, I have partici-

pated in both the development and implementation of countless security plans, many of which have involved civic centers or other large areas. Based on my past experience in securing large venues and my involvement in the security plan for the visit at issue, the area designated for demonstrators and others who wished to congregate was the nearest feasible location for groups to safely gather given the need to maintain a clear route for the motorcade and emergency vehicles and the set off distances needed to mitigate the effectiveness of a variety of weapons.

*Id.* ¶ 4. Blair contends that even if the Court were to allow this testimony by Veal as an expert, it is unsupported by facts that support the opinion and should be excluded pursuant to the rule against conclusory evidence as it is applied in *Thomas v. Christ Hospital & Medical Center,* 328 F.3d 890, 894 (7th Cir.2003). Defendants contend that Veal's testimony is admissible under either Rule 701, Opinion Testimony of a Lay Witness, or Rule 702, Testimony by Experts.

■ The Court agrees with the Defendants that Veal's testimony about the security plans for Vice President Cheney's visit to the Centre is admissible. Veal's observations are admissible as lay opinion testimony. Specifically, Veal's comments about the security zone and the demonstrator area are "rationally based on … perception" because he relies upon his own assessment of the area within the context of his experience not someone else's description of it to him. Moreover, Veal's comments are helpful to the determination of a fact at issue in the case, which is whether or not Evansville's selection of and enforcement of the demonstration area was a reasonable restriction on the place and manor of speech. Moreover, some of the factors considered by Veal arguably fall outside of the traditionally "expert" categories of information (scientific, technical or other specialized knowledge), because they are based on logistics that vary from site-to-site that makes bases for comparison difficult to select.

■ Even if the Court concluded that appropriate security measures for a visit by the Vice President to Evansville was fodder for expert testimony, the Court would conclude that Veal is qualified to testify as such as expert under Rule 702. Rule 702 requires that an expert witness be qualified "by knowledge, skill, experience, training, or education …" and that the testimony be based on sufficient facts or data, that the testimony be the product of reliable principles and methods, and that the witness apply the principles or methods reliably to the facts of the case. Fed.R.Evid. 702. Veal's three declarations evidence that he is qualified, at a minimum, by knowledge and experience to testify about appropriate security measures for a Vice Presidential visit to Evansville. *See* 1st Veal Decl. ¶¶ 1, 2, 4–7; 2d Veal Decl. ¶¶ 1–3, 5; 3d Veal Decl. ¶¶ 1–4. Moreover, Veal declares that he personally assessed the Centre and means for accessing the center as part of his responsibilities for preparing the security plan for the particular visit at issue in this case.3d Veal Decl. ¶¶ 3 & 4. This is sufficient evidence that Veal's opinion is based on facts or data relevant to the security opinion that he renders. Veal also expresses in his declarations that he was involved in planning numerous similar security situations, and never mentions that the planning phases of this project differed from any other. 1st Veal Decl. ¶¶ 1–7; 2d Veal Decl. ¶¶ 1–3. This strongly implies that the principles and methods he used to arrive at his assessment follow the standards used by security professionals in making such assessments. Blair offers no evidence to the contrary.

The Court does not agree with Blair that the reasons given by the Seventh Circuit in *Thomas* to exclude testimony of physicians apply to Veal's declaration testimony here. As just set forth by the Court, Veal's testimony has the requisite indicia of reliability, where the testimony in *Thomas* did not.

For these reasons, the Court finds that Veal's testimony is admissible under either Rule 701 or Rule 702.

## II. BACKGROUND

Defendants do not dispute the facts as Blair laid them out, therefore, the majority of the facts presented here are from Blair's brief. In large part Blair did not contest Defendants' additional facts; those uncontested facts are also set forth here.

Vice President Dick Cheney ("the Vice President" or "Vice President Cheney") visited Evansville, Indiana, on Wednesday, February 6, 2002, to appear at an event at the Centre. Schneider Dep. at 5–6. The Vice President's appearance in Evansville was his first public appearance following the attacks on the World Trade Center and Pentagon on September 11, 2001. Welcher Aff. ¶ 2.

The Centre is bounded by Locust Street to the North, Walnut Street to the South, Ninth Street to the East, and Martin Luther King Street to the West, and takes up most of a city block. *Id.* at 8, 10–11; *id.* Dep. Exhs. 1 & 2. East of the Centre, across Ninth Street, is a large parking area. *Id.* at 10; *id.* Dep. Exh. 1. On the North side, on Locust Street, there are sidewalks on either side which are public property and which are generally open to all persons for all sort of activities, including protest activities. *Id.* at 11. Across Locust Street from the Centre is a government complex, called the Civic Center. *Id.* at 8. The Civic Center contains Vanderburgh County offices, Evansville City offices, the Vanderburgh County Jail, the Evansville Police Department, and school corporation offices. *Id.* at 8–9.

Prior to the Vice President's visit local police had two or three meetings with Secret Service personnel to coordinate security. Welcher Dep. at 6–8. Representatives of the Vanderburgh County Sheriff's Department also attended the meetings. *Id.* at 8.

At the time of the Vice President's visit, Gulledge was Chief of Police for the 285-person Evansville Police Department. Gulledge Dep. at 4, 6. Gulledge is the policy maker for the day-to-day operations of the police department. *Id.* at 7. Gulledge appointed Welcher, a captain in the department, to coordinate security and to develop the security plan for the Vice President's visit at the Centre. *Id.* at 9, 12–13; Welcher Dep. at 6. Welcher had been on three Presidential/Vice Presidential security details prior to September 11, 2001 ("9/11"), and therefore was aware of federal laws allowing the Secret Service to designate areas or zones to protect the President and Vice President. Welcher Dep. at 45, 60–61. According to Welcher, the security detail involving the Vice President on this occasion, approximately five months after 9/11, had a more heightened awareness for security. *Id.* at 45; 55.

Although the Evansville Police Department provided security around the Centre for the Vice President's visit, the Secret Service was ultimately in charge of security and had the primary responsibility for the safety of Vice President Cheney. Gulledge Dep. at 12, 19–20. To develop the most effective security plan possible, the Secret Service continually looks to enhance its security measures and takes into account past occurrences as well as current conditions. Veal 2d Decl. ¶ 3. In the aftermath of the terrorist attacks on the World Trade Center and the Pentagon on 9/11, the Secret Service responded by enhancing

security measures around the White House and remaining vigilant in assessing threats to the agency's protectees. *Id.*

Generally, a Secret Service security plan to protect either the President or Vice President of the United States relies on the cooperation of federal, state and local law enforcement as well as public safety agencies. Veal 1st Decl. ¶ 4. At any event attended by the Vice President, the Secret Service creates a "secure area" in order to ensure the Vice President's physical safety. *Id.* ¶ 5. To evaluate the size and scope of the appropriate secure area at a given venue, the Secret Service considers a number of factors, including emergency vehicle access, the potential for emergency evacuation of the Vice President and other building occupants, and the set-off distances necessary to mitigate the effectiveness of a variety of weapons. Veal 2d Decl. ¶ 5.

During the meetings that Welcher had with the Secret Service, the possibility of demonstrations during the Vice President's visit was discussed. Welcher Dep. at 9. The Secret Service agent in charge, Chineme, selected a location for a protest area. Welcher Aff. ¶ 4. He determined that all demonstrators would have to go to a parking lot on the other side of Martin Luther King Street at Locust Street. Welcher Dep. at 10–11; Schneider Dep. at 12; *id.* Exhs. 1 & 2. The protest area was directly visible down Locust Street and approximately 500 feet away from the only entrance to the Centre open during the Vice President's visit. Welcher Dep. at 17; Schneider Dep. at 12; *id.* Exh. 2; Blair Aff. ¶ 1. Chineme pointed out that the location was a public area within close proximity to the venue for the Vice President's appearance and would be visible to the Vice President on his drive to the Centre. Welcher Aff. ¶ 4. The Secret Service had determined that this area was the nearest feasible location for groups to safely gather given the need to maintain a clear route for motorcade and emergency vehicles and the set-off distances needed to mitigate the effectiveness of a variety of weapons. Veal 2d Decl. ¶ 4. The decision to put demonstrators in this area was not in writing, nor was Welcher aware of whether it was publicized in any way. Welcher Dep. at 12–13.

However, Locust Street was also closed to vehicular traffic so that persons going to the event at the Centre would most probably get to the venue on Ninth Street and park in the lot that stretches behind the Centre and Civic Centre on that street. Schneider Dep. at 13; Blair Aff. ¶¶ 2–3. Ninth Street is more than two blocks from the demonstration area on the other side of Martin Luther King Street. Schneider Dep. Exh. 1. Demonstrators could not be on any of the streets or sidewalks surrounding the Centre. Welcher Dep. at 12. From a security standpoint, it may be permissible for individuals to walk outside of a secured area but not be permitted to stop and stand. Veal 2d Decl. ¶ 5. A "walking only" area can be utilized to maintain the possibility of emergency ingress and egress, and the presence of individuals or groups standing in the area could impede such access. *Id.* Accordingly, allowing individuals, either alone or in groups, to traverse an area, but not loiter, maintains pedestrian flow in and out of high-traffic areas, while not precluding the possibility of emergency ingress and egress. *Id.*

The Vice President was to appear at 5:30 p.m. Welcher Dep. at 20. His motorcade would arrive at the Centre by coming down Ninth Street into the back of the facility, which is physically more than two blocks from the protest zone across Martin Luther King Street. *Id.* at 22; *id.* Dep. Exhs. 1 & 2. Although the decision was made to ban any demonstrators from the

area around the Centre, the sidewalks around the Centre were not closed to pedestrian traffic. *Id.* at 18. By 4:00 p.m. there were many people on the sidewalks leaving the Civic Centre, going to the parking lot across Ninth Street, or going into the Centre. *Id.* at 18. However, the Secret Service had made the decision to forbid people from stopping or standing in the sidewalks around the Centre. *Id.* at 57.

Either Gulledge or Welcher, who had delegated authority from Gulledge, explicitly approved the decision to make the area around the Centre a no-demonstration zone. Gulledge Dep. at 19.

Blair is an Evansville resident who is a professional photographer and a writer. Blair Dep. at 4, 7. On February 6, 2002, in order to make a statement about the Vice President, Blair traveled to the area near the Center with a sign that stated "Cheney, 19th Century Energy Man." *Id.* at 12. The sign was a comment on the Vice President's relationship with energy companies. *Id.* at 13. The sign was approximately thirty inches by forty inches. *Id.* at 30.

Blair had intended to meet people near the Centre, however, when they did not show up by 4:15 p.m., he walked toward the venue. *Id.* at 14–17. Blair did not see any area designated for protest and did not see any person in the designated protest area as he walked by. *Id.* at 17. Therefore, he walked to an area where people attending the event could see his sign. *Id.* at 19. He stood across Locust Street from the only open entrance to the Centre and slightly northwest of that entrance. *Id.* at 19, 24; Welcher Dep. at 23. At that point, Locust Street is approximately thirty-six to forty feet wide. Welcher Dep. at 24. Blair stood approximately 100 feet from the entrance. Blair Aff. ¶ 5. He was carrying a megaphone, but testified at his deposition that it never left his shoulder. Blair Dep. at 31, 58.

Blair stood silently on the sidewalk with his sign, although people could walk around him. *Id.* at 19; Welcher Dep. at 25. With him was Malcolm Miller ("Miller"), who Blair saw near the Centre. Blair Dep. at 13–14, 25. As they stood there, pedestrians walked by them. Blair Aff. ¶ 6.

Blair stood at this location for less than five minutes before Welcher approached him. Blair Dep. at 25. Welcher noticed Blair holding the sign. Welcher Dep. at 24. Blair was not being loud or disruptive when Welcher first saw him. *Id.* However, Welcher informed Blair that he could not stand on the sidewalk because protest was not allowed in that area. *Id.* at 26–27; Blair Dep. at 26. Welcher indicated that there was a designated area for protesters that Blair had to go to if he wished to engage in protest. Welcher Dep. at 26–27; Blair Dep. at 26. Blair objected and noted that the Civic Center of the community should be an appropriate place to engage in protest. Blair Dep. at 26. Nevertheless, Welcher indicated that Mr. Blair had to move on. *Id.* Blair asked on whose authority this order was being made. *Id.* Welcher indicated that he had created a Public Safety Order requiring him to move on. *Id.;* Welcher Dep. at 30. A Public Safety Order is a technique taught to Evansville police officers to deal with crowds, demonstrations, and large groups where a need arises to take action to preserve the peace and order, and to protect public safety. Welcher Dep. at 30.

Blair and Welcher talked for about two to three minutes. *Id.* at 27. At some point Welcher stated that if Blair did not move he would be arrested. *Id.;* Blair Dep. at 27. As Blair and Welcher were talking, other officers approached. Weber Dep. at 3, 8; Hildebrandt Dep. at 6; Schneider Dep. at 16. Welcher motioned to Lieutenant Gary Weber ("Weber") to

come over to where he and Mr. Blair were talking. Weber Dep. at 3, 8. Sergeant Brian Hildebrandt ("Hildebrandt") was driving a patrol car around the Centre and stopped his car when he saw Blair and Welcher talking. Hildebrandt Dep. at 6. Hildebrandt got out of his car and stood behind Welcher. Id. 6-7. Schneider's attention was also drawn to Blair by his yelling. Schneider Dep. at 16. Schneider was across the street and down the block from Blair when he became aware of the disturbance. Id.

Blair did not want to walk to the end of the street to the location pointed out by Welcher because this area was so far away that no one attending the event, including the Vice President, would be able to see his sign. Blair Dep. at 30. Welcher told Blair on a number of occasions, apparently four or five times, that Blair had to move. Id. at 46; Welcher Dep. at 27-28, 33.

After a few minutes, Blair began to move away from the Centre towards the protest zone. Blair Dep. at 27-18; Welcher Dep. at 28. However, at least one time Blair stopped to direct more inquiries to Welcher. Blair Dep. at 27-28; Welcher Dep. at 27-28. When Mr. Blair was about ten to twelve feet away from where he had originally been on the sidewalk, he turned and asked Welcher if he could stand in the parking lot on the other side of Ninth Street where people were parking. Blair Dep. at 27. Welcher refused this request. Welcher Dep. at 33. Welcher then gave the order to arrest Blair. Id. Miller was not arrested because he left and went down the street. Id. at 62.

After Welcher gave the order to arrest Blair he left to attend to his other duties. Id. at 34-38. Blair was handcuffed by Hildebrandt. Hildebrandt Dep. at 12. Weber assisted with the arrest. Weber Dep. at 12.

During the conversation that Blair had with Welcher prior to his arrest, Blair and Welcher were speaking with raised voices, although they were not shouting or screaming. Hildebrandt Dep. at 8; Schneider Dep. at 17. Blair notes that his voice carries well and he believed that he spoke in a normal voice. Blair Dep. at 27. Weber testified that Blair's voice was louder than normal conversation, but he was not screaming. Weber Dep. at 10. At no time was Blair instructed by the police to lower his voice. Blair Aff. ¶ 7. People had stopped to watch the confrontation between Welcher and Blair; Weber told them to move on. Welcher Dep. at 30.

Blair was arrested for disorderly conduct. Welcher Dep. at 35. Although Welcher testified that he did not know whose decision it was to charge Blair with disorderly conduct, Welcher Dep. at 35, other officers recall that it was Welcher who made the decision that Blair should be charged with disorderly conduct. Hildebrandt Dep. at 13. Blair recalls that the police who were present after Welcher left discussed amongst themselves the proper charge. Blair Dep. at 31. However, Welcher testified that he felt Blair had violated the disorderly conduct statute because of Blair's noise level, because of the way he was talking, because of his activity, and because he had attracted the attention of other people. Welcher Dep. at 35-36.

According to Blair, he would have been arrested regardless of how loud he was during his conversation with Welcher. Welcher Dep. at 35. In other words, Blair claims he would have been arrested even if he had been silent, but refused to move as Welcher had requested. Id. Both Hildebrandt and Weber testified that Blair was arrested because he failed to move. Hildrebrant Dep. at 14-15; Weber Dep. at 13-14. Indeed, the probable cause affidavit completed by Hildebrandt makes no mention that Blair was loud, but only that he refused to move to the protest area

designated by Welcher. Case No. 02–003764, Aff. of Probable Cause. The affidavit states, in relevant part:

Sgt. Hildebrandt was working security at 715 Locust for a visit by Vice President Cheaney (sic). At about 1615 hours, Sgt. Hildebrandt observed Capt. Welcher talking with the defendant on the North side of Locust across from the Centre. The defendant was carrying a bullhorn and sign. It appeared as if the defendant was being uncooperative with Capt. Welcher and Sgt. Hildebrandt stopped to assist. Sgt. Hildebrandt heard Capt. Welcher advise the defendant that he was issuing a public safety order and that the defendant needed to walk down to the corner of ML King and Locust with the rest of the protesters. Capt. Welcher advised the defendant at least five times to leave or he would be arrested and he refused. After several attempts to make the defendant leave and getting no compliance, Capt. Welcher advised Sgt. Hildebrandt and Lt. Weber to arrest the defendant for disorderly conduct. Sgt. Hildebrandt placed the defendant in cuffs and Officer Jones transported him to booking. The defendant was placed in Vanderburgh County Jail with no further incident.

*Id.*

Subsequent to Blair's arrest, the Vanderburgh County Prosecutor's office charged him with resisting law enforcement. Welcher Dep. at 38; Welcher Dep. Exh. 8. Welcher was not consulted about this charged offense. *Id.* at 39. Welcher testified that he does not believe that Blair resisted law enforcement. *Id.* Blair never showed any force to Welcher. *Id.* at 68. However, Blair was uncooperative in that he refused to go to the protest area which had been designated by Welcher. Weber Dep. at 15. Once Blair was in handcuffs Hildebrandt testified that Blair resisted being placed into a patrol car and Hilde-

brandt had to put his hands on Blair to get Blair into the car. Hildrebrandt Dep. at 16–17. However, Hildrebrandt testified that he did not have to shove Blair into the car. *Id.* at 17.

After his arrest, Blair remained in jail for approximately two or three hours. Blaif Aff. ¶ 8. He was released after paying $50.00 cash. *Id.* On February 7, 2002, Blair appeared in court for a probable cause hearing. Blair Dep. Exh. A; Probable Cause Hr. Tr. (Feb. 7, 2002), at 1. At the hearing, Blair's attorney moved to dismiss the charges against him because of a lack of probable cause. Probable Cause Hr. Tr., at 2. There was no evidence heard on the motion and probable cause was found after a brief argument. *Id.* Judge Jill R. Marcrum, Magistrate of the Vanderburgh County Superior Court, specifically found that Blair had interfered with a law enforcement officer during the execution of his duties, and there was probable cause. *Id.* at 9. The charges were dismissed on February 19, 2002. Blair Dep. Exh. A.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This standard of review applies to cross motions for summary judgment. *See Int'l Bhd. of Elect. Workers v. Balmoral Racing Club, Inc.,* 293 F.3d 402, 404 (7th Cir.2002). The Court views the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant must show through specific evidence that a triable issue of fact remains on the issues on which he bears the burden of proof at trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Insolia v. Philip Morris, Inc.,* 216 F.3d 596, 599 (7th Cir.2000). With these standards in mind, the Court addresses the instant motions.

## IV. *DISCUSSION*

Blair raises three claims related to the incident that occurred outside the Centre, one for violation of his First Amendment right to protest, one for violation of his Fourth Amendment right to be from seizure without probable cause and one for false arrest or false imprisonment under Indiana state law. Each claim is addressed in turn.

## A. FIRST AMENDMENT CLAIM

Blair contends that Defendants' insistence that he conduct his protest only in the designated protest zone violated his First Amendment right to free speech because it was not narrowly tailored to serve a significant governmental interest and because it did not leave open ample alternative channels for communication.[1] Specifically, Blair challenges "safety concerns" as being too broad to satisfy the large no-protest zone created at the Centre for Vice President Cheney's appearance. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 11–15 ("Pl.'s Mem.") (citing, *inter alia, Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661

(1989); *Weinberg v. City of Chicago,* 310 F.3d 1029 (7th Cir.2002); *Bay Area Peace Navy v. United States,* 914 F.2d 1224 (9th Cir.1990); *Quaker Action Group v. Hickel,* 421 F.2d 1111 (D.C.Cir.1969)). Moreover, Blair argues that the protest zone designated by Defendants "completely insulated the attendees from receiving the protesters' message." *Id.* at 16–17 (citing, *inter alia, Gresham v. Peterson,* 225 F.3d 899 (7th Cir.2000)).

Defendants contend that protecting the Vice President is a significant government interest. In addition, "[t]he State has a strong interest in ensuring the public safety and order in promoting the free flow of traffic on public streets and sidewalks." Defs.' Mem. in Support of Cross Mot. for Summ. J. & Resp. to Pl.'s Mot for Partial Summ. J., at 7 ("Defs.' Mem.") (citing *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 768, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)). Defendants argue that this was particularly true in this instance, the first public appearance by the Vice President after the 9/11 attacks. *Id.* at 8–9. Moreover, Defendants aver that there were plenty of alternative locations for Blair to protest, including unrestricted areas along the Vice President's motorcade route, the parking lot for the event at the Centre and even inside the Centre if he had attended the event. Defendants argue that any of these locations, although perhaps not Blair's first choice, were alternative ways that he could communicate his message. *Id.* at 10–12.

■ The Court finds that the no-protest zone in this case and the creation of a designated protest zone was not a reasonable restriction on Blair's freedom of speech. The parties do not dispute the

---

1. The parties do not dispute that the no-protest zone was content-neutral. Therefore, the Court will not address that element of a First Amendment analysis.

standard for government restriction of speech in a public forum:

> the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communications of the information."

*Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Blair only disputes the "narrowly tailored" and "ample alternative channels" elements.

First, the no-protest zone at issue in this case was not narrowly tailored to serve a significant government interest. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). The inquiry is whether or not the no-protest zone "burdened substantially more speech than . . . necessary to further [Defendants'] legitimate interests." *Id.* Moreover, the no-protest zone cannot be held invalid "simply because the [C]ourt concludes that the government's interest could be adequately serviced by some less-speech-restrictive alternative." *Id.* at 800, 109 S.Ct. 2746.

Blair admits that protecting the Vice President is a significant government interest, however, he argues that Defendants' ban on protestors from the area around the Centre, including the walkway into the facility, was at a minimum inconsistent with allowing attendees to traverse the same pathway and at most completely unrelated to Defendants' express goal.

Pl.'s Mem. at 12–13. Blair avers that the inconsistency in allowing attendees to traverse the same area but not protestors evidences that the restriction was not necessary to effectuate Defendants' goal. Moreover, the largess of the no-protest zone was not narrowly tailored because it did not allow him to be seen and heard by people attending the event or by the Vice President. *Id.* at 14–16 (discussing *Madsen v. Women's Health Ctr.,* 512 U.S. 753, 769–74, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1226–27 (9th Cir. 1990); *Serv. Employee Int'l Union v. City of Los Angeles,* 114 F.Supp.2d 966, 968–71 (C.D.Cal.2000) ("*SEIU*")).

Defendants aver that the restriction to prevent pedestrians from stopping or standing in the designated security zone was important to safeguard the Vice President, and attendees of the event, particularly to ensure the safe ingress and egress of individuals in the case of an emergency. Defendants contend that the designated protest area was narrowly tailored to effectuate its purposes because it was 1) directly visible down Locust Street from the only open entrance to the Centre, 2) visible to the Vice President on his drive to the Centre, 3) safe for gathered groups of people given the need to maintain a clear route for the motorcade and emergency vehicles and the set-off distances needed to mitigate the effectiveness of a variety of weapons. Moreover, Defendants contend that the context of the Vice President's first public appearance after the 9/11 terrorists attacks made security measures particularly important.

The Court concurs with Defendants that security for this event must be looked at through the lense of the close-in-time events of 9/11. In that regard, the decision to limit the loitering, or standing, of individuals within a specific area around

the Centre was a reasonable restriction of the ability of protestors to convey their messages. Defendants considered the ingress and egress of participants, including the Vice President and the public, in regular or emergency situations, and considered the distance necessary to minimize the risk of injury from weapons. These concerns, coupled with the history of protecting the Vice President during other events and the more recent awareness for the potential of terrorism at large events in general, justified Defendants' decision to create a no-protest zone. The Court finds that without such a zone, Defendants could not have provided for the protection of Vice President Cheney or the public as effectively.

However, the restriction of protesters to an area 500 feet away from the only entrance used by attendees, and on the opposite end of the building from where Vice President Cheney would enter the facility and from where the majority of people attending the event would park, burdened speech substantially more than was necessary to further the Defendants' goals of safety. Defendants contend that this was a necessary precaution because they needed to "maintain the possibility of emergency ingress and egress, and the presence of individuals or groups standing in the area [outside the security zone] could impede such access." Defs.' Mem. at 8. But this reason just repeats the justification for having a "security zone" or "no-protest zone" in the first place. It does not add an additional danger or articulate why demonstrators needed to be corralled 500 feet from the only entrance open during the Vice President's visit. Defendants articulated no particularized threat to the Vice President or the event itself to justify the large distance between the protest zone and the intended audience. Furthermore, other cases that have looked at restrictions on access to public buildings similar to the Centre have found a violation of the First Amendment on more narrow restrictions. *See, e.g., Kuba v. 1-A Agr. Ass'n,* 387 F.3d 850, 861–62 (9th Cir.2004) (200 and 265 feet security zones found over broad); *Bay Area Peace Navy v. U.S.,* 914 F.2d 1224, 1229 (9th Cir.1990) (seventy-five yard security zone found over broad because it prevented demonstration from reaching intended audience); *but see Madsen,* 512 U.S. at 771, 114 S.Ct. 2516 (holding that a thirty-six-foot buffer zone on public property was narrow enough).

Defendants also argue that this was the place nearest to the facility that would allow protestors to be seen by the Vice President and also by attendees, plus achieve Defendants' safety goals. Yet, the parking lot used by most attendees, the one on Ninth Street, was more than 500 feet away from the protest zone. It is unlikely that persons entering the Centre for the event could see the protestors on the other side of Martin Luther King Street, who were almost the length of two football fields away, much less have the opportunity to hear any message they wished to convey. Similarly to the 1,000-foot ban in *Weinberg v. City of Chicago,* 310 F.3d 1029, 1040 (7th Cir.2002), the location of the protest zone here eliminated any meaningful avenue for the communication of ideas by the protestors to at least one intended audience, the attendees.[2]

---

**2.** Blair also contends that the protest zone prevented the Vice President from seeing his message, however, he does not dispute Defendants' proffered fact that the Vice President's motorcade would pass the protest zone on its way to the Centre. As a result, Blairs argument that the protest zone also prevented him from being seen by Vice President Cheney is without merit.

Defendants' contention that the large no-protest zone and that the specific location for the protest zone was necessary is also belied by the fact that the Vice President's motorcade was allowed to pass directly next to the protest zone.[3] If the concern about mitigating the effect of a variety of weapons weighed heavily in the decision to place the protest zone 500 feet away from the only entrance to the event, and more than 500 feet away from the parking lot where most of the attendees would park, then it is inconsistent to allow the protected target, Vice President Cheney, to be a sidewalk away from that very zone at any time.

Moreover, although Defendants contend that Blair would have been free to protest in the parking lot on Ninth Street, when Blair asked Welcher whether he could effectuate his protest there, Welcher told him no. Blair Dep. at 27; Welcher Dep. at 33. In effect, then, although Defendants need not have chosen the least restrictive means for effectuating their security purpose, even locations that they suggested were open to Blair as alternatives, were in fact closed to him by Defendants' application of their definitive protest zone. This is further indication that the protest zone was not narrowly tailored to serve Defendants' concern about safety.

■ It is for this latter reason that the Court also concludes that the protest zone was not an adequate alternative channel for communication by protestors. Although an adequate alternative channel for communication need not be the speaker's first or best choice, it "must be more than merely theoretically available. It must be realistic as well. Furthermore, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other

groups." *Gresham,* 225 F.3d at 906–07 (citations omitted). In the case at bar, the protest zone was 500 feet from the entrance for attendees, and well over 500 feet from the parking lot where the majority of attendees would park for the event. This limitation significantly curtailed Blair's ability to convey his message to one of his major targets: the event patrons.

As discussed above, Defendants' assertion that other options were available to Blair is significantly undermined by the fact that when Blair asked to conduct his protest in the parking lot across from the Centre on Ninth Street, Welcher told him no. Blair Dep. at 27; Welcher Dep. at 33. This fact belies Defendants' contention that Blair had realistic options to convey his message to his intended audience. Defendants also aver that there would have been no restriction on Blair's carrying his thirty inch by forty inch sign in to the Centre as an attendee and carrying out his protest within the Centre. There is no evidence to suggest that Defendants would have allowed this type of activity within the Centre when they decided to significantly curtail it on the outside. Defendants simply provided no adequate or realistic alternative for Blair's demonstration.

In summary, the Court finds that Defendants' creation of a large no-protest zone, and the creation of a designated protest zone 500 feet or more away from Blair's targeted audience violated Blair's First Amendment Rights. Blair's Motion for Partial Summary Judgment as to liability on his First Amendment claim should be **GRANTED**. Correspondingly, Defendants' Motion for Summary Judgment on Blair's First Amendment claim should be **DENIED**.

---

**3.** The Court assumes that the motorcade passed the protest zone because Defendants assert that the protest zone would be visible to Vice President Cheney on his drive to the Centre. Welcher Aff. ¶ 4.

## B. FOURTH AMENDMENT & FALSE IMPRISONMENT CLAIMS

Blair contends that Defendants lacked probable cause to arrest him for either disorderly conduct or resisting law enforcement, which violated his Fourth Amendment right to be free from seizure without probable cause and constitutes false arrest under Indiana law. In contrast, Defendants aver that the undisputed facts show that the officers had probable cause to arrest Blair for four different offenses: disorderly conduct, resisting or interfering with law enforcement, attempt to resist or interfere with law enforcement and/or violation of 18 U.S.C. § 1752.[4] Defendants contend that because Blair cannot prove Defendants lacked probable cause to arrest him, Blair's claims under both the Fourth Amendment and Indiana law must fail.

▉ The Court agrees with Blair that the undisputed facts show that the officers had no probable cause to arrest Blair for his conduct on February 6, 2002. The parties agree that Blair bears the burden, either under 42 U.S.C. § 1983 for his Fourth Amendment claim, or under Indiana law for his false arrest claim, to prove that Defendants lacked probable cause to arrest him. Specifically, the Fourth Amendment requires that police have probable cause to believe that a person has committed or is committing a crime before making an arrest. See United States v. Scheets, 188 F.3d 829, 836 (7th Cir.1999), cert. denied, 528 U.S. 1096, 120 S.Ct. 837, 145 L.Ed.2d 703 (2000). Under Indiana state law, Blair has the burden of establishing that the police had no proba-

ble cause to arrest him, or that the officers did not act in good faith. See Garrett v. City of Bloomington, 478 N.E.2d 89, 94 (Ind.App.1985). Probable cause exists "if the totality of the facts and circumstances known to a reasonable arresting officer would support the belief that the suspect has committed or is committing a crime." Driebel v. City of Milwaukee, 298 F.3d 622, 643 (7th Cir.2002). The Court considers the facts the way "they would have reasonably appeared to the arresting officer 'seeing what he saw, hearing what he heard' at the time of the incident." Id. (quoting Richardson v. Bonds, 860 F.2d 1427, 1431 (7th Cir.1988)). Moreover, "[a]n officer's belief in the existence of probable cause 'need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.'" Id. (quoting Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir.2000)) (emphasis added by the Driebel court). In other words, a policeman is not liable for false arrest simply because the innocence of the suspect is later proved or because the charges are later dropped. See Garrett, 478 N.E.2d at 94.

Defendants contend that the individual Defendants had probable cause to arrest Blair for either resisting law enforcement or disorderly conduct. Indiana Code § 35–44–3–3 reads, in relevant part: "A person who knowingly or intentionally ... forcibly resists, obstructs or interferes with a law enforcement officer ... while the officer is lawfully engaged in the execution of his duties as an officer ... commits resisting law enforcement, a Class A misdemeanor ...." The law in Indiana is

---

4. Section 1752 states, in relevant part:

It shall be unlawful for any person or group of persons willfully and knowingly to enter or remain in any posted, cordoned off, otherwise restricted area of a building or grounds where the President or other per-

son protected by the Secret Service is or will be temporarily visiting, in violation of the regulations governing ingress or egress thereto.

42 U.S.C. § 1752.

well settled that "forcibly" modifies all of the relevant verbs, "resists, obstructs or interferes . . . ." *See Spangler v. State*, 607 N.E.2d 720, 723 (Ind.1993) (holding that " 'forcibly' modifies the entire string of verbs in that particular section of the state, due to the placement of the adverb before the string of verbs in that particular clause"). In addition, the Indiana Supreme Court has defined "forcibly" to mean the use of "strong, powerful, violent means . . . to evade a law enforcement official's rightful exercise of his or her duties." *Id.See also Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003) (applying the Indiana Supreme Court's definition to the facts of its case).

■ In the case at bar, none of the police officers described Blair's conduct with words of force. In fact, the only thing Blair did was refuse to move. There have been cases in which a defendants' refusal to move has resulted in probable cause under this definition, *see, e.g., Wellman v. State*, 703 N.E.2d 1061, 1064 (Ind. App.1998), however, the resistance in those cases was evidenced by the need for the police officers to forcibly remove the person from the premises. No facts in the instant case indicate that Welcher or the other officers on the scene used force to remove Blair from the premises. Blair and Welcher were in a verbal sparring match from which Blair eventually retreated, but had attempted to re-engage when he was arrested. There was no forcible resistance as that term has been defined by the Indiana Supreme Court.

The individual Defendants rely upon *Potts v. City of Lafayette*, 121 F.3d 1106 (7th Cir.1997), to support their allegation that minor resistance is enough. In *Potts,* a citizen tried to enter a Ku Klux Klan rally with a personal tape recorder, which had been banned at the event without a press pass. The citizen was asked to either relinquish his tape recorder, or leave the premises. Refusing to relinquish his tape recorder, the citizen "made a movement in the direction of the rally and indicated that the officers would have to arrest him in order to stop him from going in." *Id.* at 1113. The Seventh Circuit found probable cause to arrest the citizen because the citizen had "forced himself into a position in which he was not permitted to be. An officer has a right to enforce a lawful order even if that means arresting a person who verbally refuses to obey the order and then makes a movement in furtherance of his goal of disobedience." *Id.*

Unlike in *Potts,* where the citizen had created a situation in which he would force his way into a building, or cause the police to use force to effectuate the tape recorder ban, in this case, there is no evidence that Blair forced his way anywhere, or caused the individual Defendants to use force to effectuate the no-protest zone policy. Blair had given up his verbal resistance and started walking away. He only turned back to see if another alternative would be available to him when he was arrested. None of the officers at the scene testified that Blair used force. Under this circumstance, the Court cannot agree that a reasonable officer would have concluded that probable cause existed to arrest Blair for forcible interference with a police officer. *Cf. Morfin,* 349 F.3d at 997.

■ The individual Defendants also contend that they had probable cause to arrest Blair for disorderly conduct. Indiana Code § 35–45–1–3 states, in relevant part: "A person who recklessly, knowingly, or intentionally: (1) engages in fighting or tumultuous conduct; (2) makes unreasonable noise and continues to do so after being asked to stop; or (3) disrupts lawful assembly of persons; commits disorderly conduct . . . ." "Tumultuous conduct" is defined by statute: "conduct that results in,

or is likely to result in, serious bodily injury to a person or substantial damage to property." Ind.Code § 35–45–1–1. There are no facts alleged here to support an allegation that Blair's conduct was likely to result in serious personal injury or property damage. Moreover, there are no facts to support an allegation that Blair made unreasonable noise and continued to do so after he had been asked to stop. Only one officer even mentioned that he was attracted to the location of Blair and Welcher's argument by Blair's voice. In addition, there no facts support an allegation that Blair interfered with lawful assembly of persons. Apparently a small crowd gathered during the verbal exchange between Blair and Welcher, however, they dispersed quickly when told to do so by the officers on the scene. Although Welcher may have been frustrated by Blair's argument that he should be allowed to protest closer to the Centre, a reasonable officer knowing these facts would not have concluded there was probable cause to arrest Blair for disorderly conduct. *Cf. Davis v. State*, 672 N.E.2d 1365, 1367–68 (Ind.App.1996) (finding insufficient evidence to support a conviction for disorderly conduct where defendant had refused to move, without more, during a riot when asked to do so by a police officer).

■■■ The individual Defendants also argue that they had probable cause to arrest Blair for attempting to commit the crime of interfering with a police officer. Indiana Code § 35–41–5–1 states, in relevant part, "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime." The individual Defendants contend that like the citizen in *Potts*, who tried to get into the rally with a tape recording device after being told he could not, Blair attempted to interfere with Welcher's performance of his duties, therefore,

there was probable cause to arrest Blair for attempt. The Court finds this argument unpersuasive because there are no facts to support an inference that Blair attempted to forcibly resist, obstruct or interfere with the police. Nor are there facts to support an inference that Blair took a substantial step to forcibly do anything. The uncontested evidence shows that Blair refused to move for a period of time, then started to move away toward the protest zone, then stopped to ask Welcher another question. Unlike the situation in *Potts* where the citizen tried to force his way into the facility, Blair made no threatening moves or caused Welcher to use force to counteract Blair's purposeful resistance. Welcher had told Blair that he might be arrested, but Blair never invited such conduct and had turned and walked away to comply with Welcher's request prior to his arrest. On these facts, there was no probable cause to arrest Blair for attempting to interfere with a police officer.

■■■ The individual Defendants also contend that they had probable cause to arrest Blair for violating a federal statute, 18 U.S.C. § 1752. That statute makes unlawful a persons' willful and knowing entrance into an area restricted by the Secret Service to protect the Vice President. Defendants argue that it. is uncontested that Blair entered the secured area and failed to obey Welcher's order to proceed to the demonstration zone. Therefore, the individual Defendants had probable cause to arrest Blair for violation of 18 U.S.C. § 1752.

Blair argues that this statute is not applicable to his actions because it applies to "grounds," which Blair contends the area around the Centre are not "grounds" as that term should be defined. Moreover, there were no regulations that governed the "ingress and egress" on the sidewalks

surrounding the Centre, as those were open to pedestrians on the day in question. Blair was not disrupting any official function, or the ingress or egress therefrom. Furthermore, Blair argues that raising this statute as a basis for probable cause is an *ex post facto* attempt to find probable cause from the facts. Pl.'s Opp'n Br. at 14 (citing *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir.1988)).

The Court agrees with Blair that the individual Defendants' reliance on 18 U.S.C. § 1752 is an *ex post facto* attempt to find probable cause. Although public access had been restricted in the area surrounding the Centre for the safety of the Vice President, there is no evidence that any "regulations" were in place to govern the ingress and egress to the venue. Moreover, although Welcher issued a "Public Safety Order" on the spot when he confronted Blair, he never relied upon 18 U.S.C. § 1752 or defined a regulation that prevented Blair from making his protest on Locust Street. A police officer's subjective belief is not relevant to the inquiry of whether or not a reasonable officer would have found probable cause to effectuate an arrest under these facts, however, it is evidence that use of the federal statute in such a case would be novel. Furthermore, the individual defendants never rebutted Blair's assertion that there are no citations to § 1752 in cases contained in Westlaw's online database, which further supports a finding that an arrest under this statute in the circumstances presented here is novel. "A rationale which is extravagant or novel ... may be rejected as unreasonable." *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir.1988). For this reason, the Court finds unreasonable the

individual Defendants' reliance on 18 U.S.C. § 1752.

In summary, the Court has found that a reasonable officer would not have found probable cause to arrest Blair for disorderly conduct, resisting or interfering with law enforcement, attempt to resist or interfere with law enforcement and/or violation of 18 U.S.C. § 1752. Therefore, the Court **GRANTS** Blair's Motion for Partial Summary Judgment on his Fourth Amendment[5] and False Arrest claims and **DENIES** the Defendants' Motion for Summary Judgment on those claims.

## C. QUALIFIED IMMUNITY

The individual Defendants contend that their actions on February 6, 2002, were objectively reasonable under the circumstances and that they had probable cause to arrest Blair on that day. Therefore, they contend they are entitled to immunity from suit on Blair's federal claims. In contrast, Blair claims that the individual Defendants were not objectively reasonable because the law of the First Amendment is well settled in that bans of public speech of 500 feet and on public sidewalks is generally unconstitutional as not being narrowly tailored. Moreover, Blair argues that the officers had no probable cause to arrest him for disorderly conduct, interfering with a police officer or attempt to interfere with a police officer, and the elements of those offenses being well-established under Indiana law, the individual Defendants are not entitled to qualified immunity. Blair concludes that the Secret Service recommendations not-withstanding, the individual Defendants had the authority to disregard the security plans in

---

5. The Court notes that Blair sought summary judgment on his constitutional claims against Evansville as well as the individual Defendants. Evansville did not contest this portion of Blair's arguments, therefore, the Court's rulings on Blair's constitutional claims are also rulings against Evansville.

favor of a constitutional restriction on Blair's rights.

 The defense of qualified immunity protects an individual defendant from liability under § 1983 unless his conduct violated clearly established constitutional rights of which a reasonable government official in his position would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Gomez v. Toledo*, 446 U.S. 635, 640–41, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). A two-part test determines whether a government official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir.2002). First, the Court asks whether the facts alleged demonstrate a constitutional violation when examined in the light most favorable to the plaintiff. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the facts as alleged reveal no constitutional violation, the inquiry ends and the officer prevails on the merits of the case. *See Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Estate of Phillips v. Milwaukee*, 123 F.3d 586, 596–97 (7th Cir.1997). If the facts alleged would amount to a constitutional violation, the Court next examines whether the law was "clearly established" at the relevant time. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. To adequately plead a violation of a constitutional right, a plaintiff must "offer either a closely analogous case or evidence that the defendant's conduct is patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Hope v. Pelzer*, 536 U.S. 730, 739–740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

 Application of the two-part test to the facts of this case yields different results for the two different constitutional violations Blair has alleged. Although the Court found that Defendants violated Blair's First Amendment right to protest during Vice President Cheney's visit to the Centre on February 6, 2002, he has not pointed to a closely analogous case, nor evidenced that the individual Defendants' conduct was patently violative of that right such that reasonable officers would have known it was unconstitutional without guidance from the Courts. Blair relies upon *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), for the proposition that the 500–foot buffer zone in the instant case was clearly unreasonable. However, the factual situation in *Madsen* was different. In that case, the Supreme Court determined that a 300–foot buffer between protesters and the entrance to an abortion clinic was too great a restriction on speech, however, a thirty-six-foot buffer was acceptable. *Id.* at 771, 114 S.Ct. 2516. The Court reasoned that "citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to freedoms protected by the First Amendment." *Id.* at 774, 114 S.Ct. 2516.

There is little resemblance between the security problems presented in *Madsen* and those presented in the instant case. The security problems in *Madsen* centered around whether or not patients and doctors could access the clinic. The security problems in the instant case centered around protection of the Vice President at his first non-Washington D.C. appearance after 9/11. Although there were no particularized threats alleged, the Secret Service, and Defendants, made decisions based on a much different security risk: the safety of the Vice President as well as the safe ingress and egress of event patrons in the event of an emergency evacuation of the facility. Furthermore, although not known to Defendants at the time, other Courts that have addressed security issues in a post–9/11 context have found security zones of large dimension or more

offensive restrictions on speech constitutional. *See Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 13–14 (1st Cir.2004) (finding constitutional a protest area described as "heavily secured ... pen" near the location for the 2004 Democratic National Convention); *United for Peace & Justice v. City of New York,* 243 F.Supp.2d 19, 29–31 (S.D.N.Y.2003) (finding constitutional a city's ban on a large protest march thirty-eight feet away from the United Nations property, and the city's restriction of any such large protest to a fixed location over 500 feet away); . Therefore, in light of the differences between the security issues in *Madsen* and the security issues presented to Defendants in Evansville on February 6, 2002, the Court finds that the Defendants' conduct was not so "violative of [Blair's] constitutional right that reasonable officials would know [it] without guidance from the courts." *Hope,* 536 U.S. at 739–740, 122 S.Ct. 2508. For this reason, Defendants' Motion for Summary Judgment on their qualified immunity defense to Blair's First Amendment claim is **GRANTED**.

■ With respect to Blair's Fourth Amendment claim, however, the Court finds that a reasonable officer would have known that Blair's conduct did not give the individual Defendants probable cause to arrest Blair for disorderly conduct, resisting or interfering with law enforcement or attempt to resist or interfere with law enforcement. In February 2002, the law of disorderly conduct in Indiana was clear: the person must either fight or engage in tumultuous conduct, make unreasonable noise and continue to do so after being asked to stop or disrupt a lawful assembly of persons. Ind.Code § 35–45–1–3. As discussed earlier in this opinion, there is no evidence that Blair's conduct fit any of these three definitions. Similarly, Indiana law on resisting or interfering with law enforcement has required "forcibl[e]" interference since 1993. *See Spangler,* 607

N.E.2d at 723. There is no evidence that Blair used any force during the incident giving rise to his arrest. This is true even under the more liberal interpretation of the term "forcibly" by the Seventh Circuit in *Potts. See Potts,* 121 F.3d at 1113. Blair had turned to leave the scene of the confrontation with Welcher and had merely turned back to ask a legitimate question when Welcher gave the order to have Blair arrested. A reasonable officer under the circumstances would have known that no probable cause existed to arrest Blair for interfering with a police officer.

In addition, the Court concludes that a the law was equally clear with respect to the offense of attempt to interfere with a police officer because Blair did not act with the culpability required of the underlying offense nor did he take a substantial step to forcibly do anything. A reasonable officer would not have found probable cause to arrest Blair for attempt.

Finally, the Court found that the individual Defendants' reliance upon 18 U.S.C. § 1752 to support their arrest of Blair was an *ex post facto* attempt to find probable cause. The facts indicate that Welcher had experience dealing with situations in which the Secret Service had developed a security plan and the cooperation required between local law enforcement and the Secret Service in situations similar to that of the Vice President's visit at issue in this case. A reasonable officer under the circumstances would know that an arrest for violation of this statute would be novel, and such rationale has been held unreasonable since at least 1988. *See Richardson,* 860 F.2d at 1431. For this reason, the Court rejects the individual Defendants' attempt to seek qualified immunity based on their probable cause to arrest Blair for violation of 18 U.S.C. § 1752.

For the foregoing reasons, the Court **DENIES** the individual Defendants' Mo-

tion for Summary Judgment on their qualified immunity defense to Blair's Fourth Amendment claim.

## V. CONCLUSION

For the reasons stated herein, plaintiff's, John Blair, Motion to Strike is **DENIED**; plaintiff's, John Blair, Motion for Partial Summary Judgment is **GRANTED in part and DENIED in part**. Defendants, City of Evansville, Indiana, Officer William Welcher, Officer B. Hildebrandt, Officer C. Jones, and Officer G. Weber, Motion for Summary Judgment is **GRANTED in part and DENIED in part**. Defendants, City of Evansville, Indiana, Officer William Welcher, Officer B. Hildebrandt, Officer C. Jones, and Officer G. Weber, violated plaintiff's First Amendment right to protest on February 6, 2002, however, the Court has found that the individual Defendants, Officer Welcher, Officer Hildebrandt, Officer Jones and Officer Weber, have prevailed on their qualified immunity defense for that violation. Defendants, City of Evansville, Indiana, Officer William Welcher, Officer B. Hildebrandt, Officer C. Jones, and Officer G. Weber, also violated plaintiff's Fourth Amendment right when they arrested him without probable cause and are liable to plaintiff for his state law claim of false arrest. The individual Defendants did not prevail on their qualified immunity defense for violation of plaintiff's Fourth Amendment right.

The only issue that remains in this cause is damages. This cause remains **STAYED** pending the return of William Welcher from active duty in the military. The status conference currently scheduled for April 11, 2005, is **CONFIRMED**.